KER ET UX. *v.* CALIFORNIA.

No. 53. Argued December 11, 1962.—Decided June 10, 1963.

*Robert W. Stanley* argued the cause and filed a brief for petitioners.

*Gordon Ringer,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *Stanley Mosk,* Attorney General, and *William E. James,* Assistant Attorney General.

*A. L. Wirin, Fred Okrand* and *Paul Cooksey* filed a brief for the American Civil Liberties Union of Southern California, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court with reference to the standard by which state searches and seizures must be evaluated (Part I), together with an opinion applying that standard, in which MR. JUSTICE BLACK, MR. JUSTICE STEWART and MR. JUSTICE WHITE join (Parts II–V), and announced the judgment of the Court.

This case raises search and seizure questions under the rule of *Mapp* v. *Ohio,* 367 U. S. 643 (1961). Petitioners, husband and wife, were convicted of possession of marijuana in violation of § 11530 of the California Health and Safety Code. The California District Court of Appeal affirmed, 195 Cal. App. 2d 246, 15 Cal. Rptr. 767, despite the contention of petitioners that their arrests in their

apartment without warrants lacked probable cause [1] and the evidence seized incident thereto and introduced at their trial was therefore inadmissible. The California Supreme Court denied without opinion a petition for hearing. This being the first case arriving here since our opinion in *Mapp* which would afford suitable opportunity for further explication of that holding in the light of intervening experience, we granted certiorari. 368 U. S. 974. We affirm the judgment before us.

The state courts' conviction and affirmance are based on these events, which culminated in the petitioners' arrests. Sergeant Cook of the Los Angeles County Sheriff's Office, in negotiating the purchase of marijuana from one Terrhagen, accompanied him to a bowling alley about 7 p. m. on July 26, 1960, where they were to meet Terrhagen's "connection." Terrhagen went inside and returned shortly, pointing to a 1946 DeSoto as his "connection's" automobile and explaining that they were to meet him "up by the oil fields" near Fairfax and Slauson Avenues in Los Angeles. As they neared that location, Terrhagen again pointed out the DeSoto traveling ahead of them, stating that the "connection" kept his supply of narcotics "somewhere up in the hills." They parked near some vacant fields in the vicinity of the intersection of Fairfax and Slauson, and, shortly thereafter, the DeSoto reappeared and pulled up beside them. The deputy then recognized the driver as one Roland Murphy, whose "mug" photograph he had seen and whom he knew from other narcotics officers to be a large-scale seller of marijuana currently out on bail in connection with narcotics charges.

---

[1] This contention was initially raised prior to the trial. Section 995, California Penal Code, provides for a motion to set aside the information on the ground that the defendant has been committed without probable cause. Evidence on that issue was presented out of the presence of the jury, and, following the court's denial of the motion, the petitioners were tried and convicted by the jury.

Terrhagen entered the DeSoto and drove off toward the oil fields with Murphy, while the Sergeant waited. They returned shortly, Terrhagen left Murphy's car carrying a package of marijuana and entered his own vehicle, and they drove to Terrhagen's residence. There Terrhagen cut one pound of marijuana and gave it to Sergeant Cook, who had previously paid him. The Sergeant later reported this occurrence to Los Angeles County Officers Berman and Warthen, the latter of whom had observed the occurrences as well.

On the following day, July 27, Murphy was placed under surveillance. Officer Warthen, who had observed the Terrhagen-Murphy episode the previous night, and Officer Markman were assigned this duty. At about 7 p. m. that evening they followed Murphy's DeSoto as he drove to the same bowling alley in which he had met Terrhagen on the previous evening. Murphy went inside, emerged in about 10 minutes and drove to a house where he made a brief visit. The officers continued to follow him but, upon losing sight of his vehicle, proceeded to the vicinity of Fairfax and Slauson Avenues where they parked. There, immediately across the street from the location at which Terrhagen and Sergeant Cook had met Murphy on the previous evening, the officers observed a parked automobile whose lone occupant they later determined to be the petitioner George Douglas Ker.

The officers then saw Murphy drive past them. They followed him but lost sight of him when he extinguished his lights and entered the oil fields. The officers returned to their vantage point and, shortly thereafter, observed Murphy return and park behind Ker. From their location approximately 1,000 feet from the two vehicles, they watched through field glasses. Murphy was seen leaving his DeSoto and walking up to the driver's side of Ker's car, where he "appeared to have conversation with him." It was shortly before 9 p. m. and the distance in the

twilight was too great for the officers to see anything pass between Murphy and Ker or whether the former had anything in his hands as he approached.

While Murphy and Ker were talking, the officers had driven past them in order to see their faces closely and in order to take the license number from Ker's vehicle. Soon thereafter Ker drove away and the officers followed him but lost him when he made a U-turn in the middle of the block and drove in the opposite direction. Now, having lost contact with Ker, they checked the registration with the Department of Motor Vehicles and ascertained that the automobile was registered to Douglas Ker at 4801 Slauson. They then communicated this information to Officer Berman, within 15 to 30 minutes after observing the meeting between Ker and Murphy. Though officers Warthen and Markman had no previous knowledge of Ker, Berman had received information at various times beginning in November of 1959 that Ker was selling marijuana from his apartment and that "he was possibly securing this Marijuana from Ronnie Murphy who is the alias of Roland Murphy." In early 1960 Officer Berman had received a "mug" photograph of Ker from the Inglewood Police Department. He further testified that between May and July 27, 1960, he had received information as to Ker from one Robert Black, who had previously given information leading to at least three arrests and whose information was believed by Berman to be reliable. According to Officer Berman, Black had told him on four or five occasions after May 1960 that Ker and others, including himself, had purchased marijuana from Murphy.[2]

---

[2] During the hearing on the § 995 motion, see note 1, *supra*, Black testified for the defense, admitting that he knew the petitioners but denying that he gave Officer Berman information about George Ker. Black first denied but then admitted that he had met with Officer Berman and another officer in whose presence Berman said the information about Ker was given.

Armed with the knowledge of the meeting between Ker and Murphy and with Berman's information as to Ker's dealings with Murphy, the three officers and a fourth, Officer Love, proceeded immediately to the address which they had obtained through Ker's license number. They found the automobile which they had been following—and which they had learned was Ker's—in the parking lot of the multiple-apartment building and also ascertained that there was someone in the Kers' apartment. They then went to the office of the building manager and obtained from him a passkey to the apartment. Officer Markman was stationed outside the window to intercept any evidence which might be ejected, and the other three officers entered the apartment. Officer Berman unlocked and opened the door, proceeding quietly, he testified, in order to prevent the destruction of evidence,[3] and found petitioner George Ker sitting in the living room. Just as he identified himself, stating that "We are Sheriff's Narcotics Officers, conducting a narcotics investigation," petitioner Diane Ker emerged from the kitchen. Berman testified that he repeated his identification to her and immediately walked to the kitchen. Without entering, he observed through the open doorway a small scale atop the kitchen sink, upon which lay a "brick-like—brick-shaped package containing the green leafy substance" which he recognized as marijuana. He beckoned the petitioners into the kitchen where, following their denial of knowledge of the contents of the two-and-two-tenths-pound package and

---

[3] Arresting Officers Berman and Warthen had been attached to the narcotics detail of the Los Angeles County Sheriff's office for three and four years, respectively. Each had participated in hundreds of arrests involving marijuana. Warthen testified that on "many, many occasions" in his experience with narcotics arrests "persons have flushed narcotics down toilets, pushed them down drains and sinks and many other methods of getting rid of them prior to my entrance . . . ."

failure to answer a question as to its ownership, he placed them under arrest for suspicion of violating the State Narcotic Law. Officer Markman testified that he entered the apartment approximately "a minute, minute and a half" after the other officers, at which time Officer Berman was placing the petitioners under arrest. As to this sequence of events, petitioner George Ker testified that his arrest took place immediately upon the officers' entry and before they saw the brick of marijuana in the kitchen.

Subsequent to the arrest and the petitioners' denial of possession of any other narcotics, the officers, proceeding without search warrants, found a half-ounce package of marijuana in the kitchen cupboard and another atop the bedroom dresser. Petitioners were asked if they had any automobile other than the one observed by the officers, and George Ker replied in the negative, while Diane remained silent. On the next day, having learned that an automobile was registered in the name of Diane Ker, Officer Warthen searched this car without a warrant, finding marijuana and marijuana seeds in the glove compartment and under the rear seat. The marijuana found on the kitchen scale, that found in the kitchen cupboard and in the bedroom, and that found in Diane Ker's automobile [4] were all introduced into evidence against the petitioners.

The California District Court of Appeal in affirming the convictions found that there was probable cause for the arrests; that the entry into the apartment was for the purpose of arrest and was not unlawful; and that the search being incident to the arrests was likewise lawful and its fruits admissible in evidence against petitioners. These conclusions were essential to the affirmance, since the California Supreme Court in 1955 had held that evi-

---

[4] For the reasons discussed in § V of this opinion, we find that the validity of the search of the automobile is not before us and we therefore do not pass on it.

dence obtained by means of unlawful searches and seizures
was inadmissible in criminal trials. *People* v. *Cahan,* 44
Cal. 2d 434, 282 P. 2d 905. The court concluded that in
view of its findings and the implied findings of the trial
court, this Court's intervening decision in *Mapp* v. *Ohio,*
*supra,* did "not justify a change in our original conclu-
sion." 195 Cal. App. 2d, at 257, 15 Cal. Rptr., at 773.

## I.

In *Mapp* v. *Ohio,* at 646–647, 657, we followed *Boyd* v.
*United States,* 116 U. S. 616, 630 (1886), which held that
the Fourth Amendment,[5] implemented by the self-incrimi-
nation clause of the Fifth,[6] forbids the Federal Govern-
ment to convict a man of crime by using testimony or
papers obtained from him by unreasonable searches and
seizures as defined in the Fourth Amendment. We spe-
cifically held in *Mapp* that this constitutional prohibition
is enforceable against the States through the Fourteenth
Amendment.[7] This means, as we said in *Mapp,* that the
Fourth Amendment "is enforceable against them [the
states] by the same sanction of exclusion as is used against
the Federal Government," by the application of the
same constitutional standard prohibiting "unreasonable

---

[5] "The right of the people to be secure in their persons, houses,
papers, and effects, against unreasonable searches and seizures, shall
not be violated, and no Warrants shall issue, but upon probable cause,
supported by Oath or affirmation, and particularly describing the
place to be searched, and the persons or things to be seized."

[6] "No person . . . shall be compelled in any criminal case to be a
witness against himself . . . ."

[7] Our holding as to enforceability of this federal constitutional
rule against the States had its source in the following declaration in
*Wolf* v. *Colorado,* 338 U. S. 25, 27–28 (1949):

"The security of one's privacy against arbitrary instrusion by the
police—which is at the core of the Fourth Amendment—is . . . im-
plicit in 'the concept of ordered liberty' and as such enforceable
against the States through the Due Process Clause."

searches and seizures." 367 U. S., at 655. We now face the specific question as to whether *Mapp* requires the exclusion of evidence in this case which the California District Court of Appeal has held to be lawfully seized. It is perhaps ironic that the initial test under the *Mapp* holding comes from California, whose decision voluntarily to adopt the exclusionary rule in 1955 has been commended by us previously. See *Mapp* v. *Ohio, supra,* at 651–652; *Elkins* v. *United States,* 364 U. S. 206, 220 (1960).

Preliminary to our examination of the search and seizures involved here, it might be helpful for us to indicate what was not decided in *Mapp*. First, it must be recognized that the "principles governing the admissibility of evidence in federal criminal trials have not been restricted . . . to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts . . . this Court has . . . formulated rules of evidence to be applied in federal criminal prosecutions." *McNabb* v. *United States,* 318 U. S. 332, 341 (1943); cf. *Miller* v. *United States,* 357 U. S. 301 (1958); *Nardone* v. *United States,* 302 U. S. 379 (1937). *Mapp,* however, established no assumption by this Court of supervisory authority over state courts, cf. *Cleary* v. *Bolger,* 371 U. S. 392, 401 (1963), and, consequently, it implied no total obliteration of state laws relating to arrests and searches in favor of federal law. *Mapp* sounded no death knell for our federalism; rather, it echoed the sentiment of *Elkins* v. *United States, supra,* at 221, that "a healthy federalism depends upon the avoidance of needless conflict between state and federal courts" by itself urging that "[f]ederal-state cooperation in the solution of crime under constitutional standards will be promoted, if only by recognition of their now mutual obligation to respect *the same fundamental criteria* in their approaches." 367 U. S., at 658. (Emphasis added.) Second, *Mapp* did not attempt the impossible task of lay-

ing down a "fixed formula" for the application in specific cases of the constitutional prohibition against unreasonable searches and seizures; it recognized that we would be "met with 'recurring questions of the reasonableness of searches'" and that, "at any rate, '[r]easonableness is in the first instance for the [trial court] ... to determine,'" *id.*, at 653, thus indicating that the usual weight be given to findings of trial courts.

*Mapp*, of course, did not lend itself to a detailed explication of standards, since the search involved there was clearly unreasonable and bore no stamp of legality even from the Ohio Supreme Court. *Id.*, at 643–645. This is true also of *Elkins* v. *United States,* where all of the courts assumed the unreasonableness of the search in question and this Court "invoked" its "supervisory power over the administration of criminal justice in the federal courts," 364 U. S., at 216, in declaring that the evidence so seized by state officers was inadmissible in a federal prosecution. The prosecution being in a federal court, this Court of course announced that "[t]he test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Id.,* at 224. Significant in the *Elkins* holding is the statement, apposite here, that "it can fairly be said that in applying the Fourth Amendment this Court has seldom shown itself unaware of the practical demands of effective criminal investigation and law enforcement." *Id.*, at 222.

Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be "as of the very essence of constitutional liberty" the guaranty of which "is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen ...." *Gouled* v. *United States,* 255 U. S. 298, 304 (1921); cf. *Powell* v. *Alabama,* 287 U. S.

45, 65–68 (1932). While the language of the Amendment is "general," it "forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made . . . ." *Go-Bart Importing. Co.* v. *United States,* 282 U. S. 344, 357 (1931). Mr. Justice Butler there stated for the Court that "[t]he Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." *Ibid.* He also recognized that "[t]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." *Ibid.;* see *United States* v. *Rabinowitz,* 339 U. S. 56, 63 (1950); *Rios* v. *United States,* 364 U. S. 253, 255 (1960).

This Court's long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application is carried forward when that Amendment's proscriptions are enforced against the States through the Fourteenth Amendment. And, although the standard of reasonableness is the same under the Fourth and Fourteenth Amendments, the demands of our federal system compel us to distinguish between evidence held inadmissible because of our supervisory powers over federal courts and that held inadmissible because prohibited by the United States Constitution. We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the "fundamental criteria" laid down by the Fourth Amendment and in opinions of this Court applying that Amendment. Findings of reasonableness, of course, are respected only insofar as consistent with federal constitutional guarantees. As we have stated above and in other cases in-

volving federal constitutional rights, findings of state courts are by no means insulated against examination here. See, *e. g.*, *Spano* v. *New York,* 360 U. S. 315, 316 (1959); *Thomas* v. *Arizona,* 356 U. S. 390, 393 (1958); *Pierre* v. *Louisiana,* 306 U. S. 354, 358 (1939). While this Court does not sit as in *nisi prius* to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental—*i. e.*, constitutional—criteria established by this Court have been respected. The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet "the practical demands of effective criminal investigation and law enforcement" in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain. See *Jones* v. *United States,* 362 U. S. 257 (1960). Such a standard implies no derogation of uniformity in applying federal constitutional guarantees but is only a recognition that conditions and circumstances vary just as do investigative and enforcement techniques.

Applying this federal constitutional standard we proceed to examine the entire record including the findings of California's courts to determine whether the evidence seized from petitioners was constitutionally admissible under the circumstances of this case.

## II.

The evidence at issue, in order to be admissible, must be the product of a search incident to a lawful arrest, since the officers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon

probable cause, which exists "where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar* v. *United States,* 338 U. S. 160, 175–176 (1949); quoting from *Carroll* v. *United States,* 267 U. S. 132, 162 (1925); accord, *People* v. *Fischer,* 49 Cal. 2d 442, 317 P. 2d 967 (1957); *Bompensiero* v. *Superior Court,* 44 Cal. 2d 178, 281 P. 2d 250 (1955). The information within the knowledge of the officers at the time they arrived at the Kers' apartment, as California's courts specifically found, clearly furnished grounds for a reasonable belief that petitioner George Ker had committed and was committing the offense of possession of marijuana. Officers Markman and Warthen observed a rendezvous between Murphy and Ker on the evening of the arrest which was a virtual reenactment of the previous night's encounter between Murphy, Terrhagen and Sergeant Cook, which concluded in the sale by Murphy to Terrhagen and the Sergeant of a package of marijuana of which the latter had paid Terrhagen for one pound which he received from Terrhagen after the encounter with Murphy. To be sure, the distance and lack of light prevented the officers from seeing and they did not see any substance pass between the two men, but the virtual identity of the surrounding circumstances warranted a strong suspicion that the one remaining element—a sale of narcotics—was a part of this encounter as it was the previous night. But Ker's arrest does not depend upon this single episode with Murphy. When Ker's U-turn thwarted the officer's pursuit, they learned his name and address from the Department of Motor Vehicles and reported the occurrence to Officer Berman. Berman, in turn, revealed information from an informer whose reliability had been tested previously, as

well as from other sources, not only that Ker had been
selling marijuana from his apartment but also that his
likely source of supply was Murphy himself. That this
information was hearsay does not destroy its role in estab-
lishing probable cause. *Brinegar* v. *United States, supra.*
In *Draper* v. *United States,* 358 U. S. 307 (1959), we held
that information from a reliable informer, corroborated
by the agents' observations as to the accuracy of the
informer's description of the accused and of his presence
at a particular place, was sufficient to establish probable
cause for an arrest without warrant.[8] The corroborative
elements in *Draper* were innocuous in themselves, but
here both the informer's tip and the personal observations
connected Ker with specific illegal activities involving
the same man, Murphy, a known marijuana dealer. To
say that this coincidence of information was sufficient
to support a reasonable belief of the officers that Ker
was illegally in possession of marijuana is to indulge in
understatement.

Probable cause for the arrest of petitioner Diane Ker,
while not present at the time the officers entered the
apartment to arrest her husband, was nevertheless pres-
ent at the time of her arrest. Upon their entry and
announcement of their identity, the officers were met
not only by George Ker but also by Diane Ker, who was
emerging from the kitchen. Officer Berman immediately
walked to the doorway from which she emerged and, with-
out entering, observed the brick-shaped package of mari-
juana in plain view. Even assuming that her presence in

---

[8] In *Draper* the arrest upon probable cause was authorized under
26 U. S. C. § 7607, authorizing narcotics agents to make an arrest
without warrant if they have "reasonable grounds to believe that
the person to be arrested has committed or is committing such vio-
lation." Under § 836, California Penal Code, an officer may arrest
without a warrant if he has "reasonable cause to believe that the
person to be arrested has committed a felony . . . ."

a small room with the contraband in a prominent position on the kitchen sink would not alone establish a reasonable ground for the officers' belief that she was in joint possession with her husband, that fact was accompanied by the officers' information that Ker had been using his apartment as a base of operations for his narcotics activities. Therefore, we cannot say that at the time of her arrest there were not sufficient grounds for a reasonable belief that Diane Ker, as well as her husband, was committing the offense of possession of marijuana in the presence of the officers.

## III.

It is contended that the lawfulness of the petitioners' arrests, even if they were based upon probable cause, was vitiated by the method of entry. This Court, in cases under the Fourth Amendment, has long recognized that the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution. *Miller* v. *United States, supra; United States* v. *Di Re,* 332 U. S. 581 (1948); *Johnson* v. *United States,* 333 U. S. 10, 15, n. 5 (1948). *A fortiori,* the lawfulness of these arrests by state officers for state offenses is to be determined by California law. California Penal Code, § 844,[9] permits peace officers to break into a dwelling place for the purpose of arrest after demanding admittance and explaining their purpose. Admittedly the officers did not comply with the terms of this statute since they entered quietly and without announcement, in order to prevent the destruction of contraband. The California District Court of Appeal,

---

[9] "To make an arrest, . . . in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which . . . [he has] reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

however, held that the circumstances here came within a judicial exception which had been engrafted upon the statute by a series of decisions, see, *e. g.*, *People* v. *Ruiz*, 146 Cal. App. 2d 630, 304 P. 2d 175 (1956); *People* v. *Maddox*, 46 Cal. 2d 301, 294 P. 2d 6, cert. denied, 352 U. S. 858 (1956), and that the noncompliance was therefore lawful.

Since the petitioners' federal constitutional protection from unreasonable searches and seizures by police officers is here to be determined by whether the search was incident to a lawful arrest, we are warranted in examining that arrest to determine whether, notwithstanding its legality under state law, the method of entering the home may offend federal constitutional standards of reasonableness and therefore vitiate the legality of an accompanying search. We find no such offensiveness on the facts here. Assuming that the officers' entry by use of a key obtained from the manager is the legal equivalent of a "breaking," see *Keiningham* v. *United States,* 109 U. S. App. D. C. 272, 276, 287 F. 2d 126, 130 (C. A. D. C. Cir. 1960), it has been recognized from the early common law that such breaking is permissible in executing an arrest under certain circumstances. See Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 800–806 (1924). Indeed, 18 U. S. C. § 3109,[10] dealing with the execution of search warrants by federal officers, authorizes breaking of doors in words very similar to those of the California statute, both statutes including a requirement of notice of authority and purpose. In *Miller* v. *United States, supra,* this Court held unlawful an arrest, and therefore its accompanying search, on the ground that the District of

---

[10] "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

Columbia officers before entering a dwelling did not fully satisfy the requirement of disclosing their identity and purpose. The Court stated that "the lawfulness of the arrest without warrant is to be determined by reference to state law. . . . By like reasoning the validity of the arrest of petitioner is to be determined by reference to the law of the District of Columbia." 357 U. S., at 305–306. The parties there conceded and the Court accepted that the criteria for testing the arrest under District of Columbia law were "substantially identical" to the requirements of § 3109. *Id.,* at 306. Here, however, the criteria under California law clearly include an exception to the notice requirement where exigent circumstances are present. Moreover, insofar as violation of a federal statute required the exclusion of evidence in *Miller,* the case is inapposite for state prosecutions, where admissibility is governed by constitutional standards. Finally, the basis of the judicial exception to the California statute, as expressed by Justice Traynor in *People* v. *Maddox,* 46 Cal. 2d, at 306, 294 P. 2d, at 9, effectively answers the petitioners' contention:

> "It must be borne in mind that the primary purpose of the constitutional guarantees is to prevent unreasonable invasions of the security of the people in their persons, houses, papers, and effects, and when an officer has reasonable cause to enter a dwelling to make an arrest and as an incident to that arrest is authorized to make a reasonable search, his entry and his search are not unreasonable. Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guarantees are violated because an officer succeeds in getting to a place where he is entitled to be more quickly than he would, had he complied with section 844. Moreover, since the demand and explanation require-

ments of section 844 are a codification of the common law, they may reasonably be interpreted as limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose. (*Read* v. *Case*, 4 Conn. 166, 170 [10 Am. Dec. 110]; see Rest., Torts, § 206, com. d.) Without the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide these questions in the first instance."

No such exigent circumstances as would authorize noncompliance with the California statute were argued in *Miller*, and the Court expressly refrained from discussing the question, citing the *Maddox* case without disapproval. 357 U. S., at 309.[11] Here justification for the officers' failure to give notice is uniquely present. In addition to the officers' belief that Ker was in possession of narcotics, which could be quickly and easily destroyed, Ker's furtive conduct in eluding them shortly before the arrest was ground for the belief that he might well have been expecting the police.[12] We therefore hold that in the par-

---

[11] Nor has the Court rejected the proposition that noncompliance may be reasonable in exigent circumstances subsequent to *Miller*. In *Wong Sun* v. *United States*, 371 U. S. 471 (1963), the Court held that federal officers had not complied with § 3109 in executing an arrest. There the Court noted that in *Miller* it had reserved the question of an exception in exigent circumstances and stated that "[h]ere, as in *Miller*, the Government claims no extraordinary circumstances—such as the imminent destruction of vital evidence, or the need to rescue a victim in peril— . . . which excused the officer's failure truthfully to state his mission before he broke in." *Id.*, at 483–484.

[12] A search of the record with the aid of hindsight may lend some support to the conclusion that, contra the reasonable belief of the officers, petitioners may not have been prepared for an imminent visit from the police. It goes without saying that in determining the lawfulness of entry and the existence of probable cause we may

ticular circumstances of this case the officers' method of entry, sanctioned by the law of California, was not unreasonable under the standards of the Fourth Amendment as applied to the States through the Fourteenth Amendment.

## IV.

Having held the petitioners' arrests lawful, it remains only to consider whether the search which produced the evidence leading to their convictions was lawful as incident to those arrests. The doctrine that a search without warrant may be lawfully conducted if incident to a lawful arrest has long been recognized as consistent with the Fourth Amendment's protection against unreasonable searches and seizures. See *Marron* v. *United States,* 275 U. S. 192 (1927); *Harris* v. *United States,* 331 U. S. 145 (1947); *Abel* v. *United States,* 362 U. S. 217 (1960); Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Cal. L. Rev. 474, 490–493 (1961). The cases have imposed no requirement that the arrest be under authority of an arrest warrant, but only that it be lawful. See *Marron* v. *United States, supra,* at 198–199; *United States* v. *Rabinowitz, supra,* at 61; cf. *Agnello* v. *United States,* 269 U. S. 20, 30–31 (1925). The question remains whether the officers' action here exceeded the recognized bounds of an incidental search.

Petitioners contend that the search was unreasonable in that the officers could practicably have obtained a search warrant. The practicability of obtaining a warrant is not the controlling factor when a search is sought to be justified as incident to arrest, *United States* v. *Rabinowitz,*

---

concern ourselves only with what the officers had reason to believe *at the time of their entry. Johnson* v. *United States,* 333 U. S. 10, 17 (1948). As the Court said in *United States* v. *Di Re,* 332 U. S. 581, 595 (1948), "a search is not to be made legal by what it turns up. In law it is good *or bad* when it starts and does not change character from" what is dug up subsequently. (Emphasis added.)

*supra;* but we need not rest the validity of the search here on *Rabinowitz,* since we agree with the California court that time clearly was of the essence. The officers' observations and their corroboration, which furnished probable cause for George Ker's arrest, occurred at about 9 p. m., approximately one hour before the time of arrest. The officers had reason to act quickly because of Ker's furtive conduct and the likelihood that the marijuana would be distributed or hidden before a warrant could be obtained at that time of night.[13] Thus the facts bear no resemblance to those in *Trupiano* v. *United States,* 334 U. S. 699 (1948), where federal agents for three weeks had been in possession of knowledge sufficient to secure a search warrant.

The search of the petitioners' apartment was well within the limits upheld in *Harris* v. *United States, supra,* which also concerned a private apartment dwelling. The evidence here, unlike that in *Harris,* was the instrumentality of the very crime for which petitioners were arrested, and the record does not indicate that the search here was as extensive in time or in area as that upheld in *Harris.*

The petitioners' only remaining contention is that the discovery of the brick of marijuana cannot be justified as incidental to arrest since it preceded the arrest. This contention is of course contrary to George Ker's testimony, but we reject it in any event. While an arrest may not be used merely as the pretext for a search without warrant, the California court specifically found and the record supports both that the officers entered the apartment for

---

[13] In cases in which a search could not be regarded as incident to arrest because the petitioner was not present at the time of the entry and search, the absence of compelling circumstances, such as the threat of destruction of evidence, supported the Court's holdings that searches without warrants were unconstitutional. See *Chapman* v. *United States,* 365 U. S. 610, 615 (1961); *United States* v. *Jeffers,* 342 U. S. 48, 52 (1951); *Taylor* v. *United States,* 286 U. S. 1, 5 (1932).

the purpose of arresting George Ker and that they had probable cause to make that arrest prior to the entry.[14] We cannot say that it was unreasonable for Officer Berman, upon seeing Diane Ker emerge from the kitchen, merely to walk to the doorway of that adjacent room. We thus agree with the California court's holding that the discovery of the brick of marijuana did not constitute a search, since the officer merely saw what was placed before him in full view. *United States* v. *Lee,* 274 U. S. 559 (1927); *United States* v. *Lefkowitz,* 285 U. S. 452, 465 (1932); *People* v. *West,* 144 Cal. App. 2d 214, 300 P. 2d 729 (1956). Therefore, while California law does not require that an arrest precede an incidental search as long as probable cause exists at the outset, *Willson* v. *Superior Court,* 46 Cal. 2d 291, 294 P. 2d 36 (1956), the California court did not rely on that rule and we need not reach the question of its status under the Federal Constitution.

## V.

The petitioners state and the record bears out that the officers searched Diane Ker's automobile on the day subsequent to her arrest. The reasonableness of that search, however, was not raised in the petition for certiorari, nor was it discussed in the brief here. Ordinarily "[w]e do not reach for constitutional questions not raised by the parties," *Mazer* v. *Stein,* 347 U. S. 201, 206, n. 5 (1954), nor extend our review beyond those specific federal ques-

---

[14] Compare *Johnson* v. *United States,* note 12, *supra,* at 40. There the Court held that a search could not be justified as incident to arrest since the officers, prior to their entry into a hotel room, had no probable cause for the arrest of the occupant. The Court stated that "[a]n officer gaining access to private living quarters under color of his office and of the law which he personifies must then have some valid basis in law for the intrusion." Here, of course, probable cause for the arrest of petitioner George Ker provided that valid basis.

tions properly raised in the state court. The record gives no indication that the issue was raised in the trial court or in the District Court of Appeal, the latter court did not adjudicate it and we therefore find no reason to reach it on the record.[15]

For these reasons the judgment of the California District Court of Appeal is

*Affirmed.*

MR. JUSTICE HARLAN, concurring in the result.

Heretofore there has been a well-established line of demarcation between the constitutional principles governing the standards for state searches and seizures and those controlling federal activity of this kind. Federal searches and seizures have been subject to the requirement of "reasonableness" contained in the Fourth Amendment, as that requirement has been elaborated over the years in federal litigation. State searches and seizures, on the other hand, have been judged, and in my view properly so, by the more flexible concept of "fundamental" fairness, of rights "basic to a free society," embraced in the Due Process Clause of the Fourteenth Amendment.

---

[15] The record shows that petitioners made no objection to the admission of any of the evidence, thus failing to observe a state procedural requirement, *People* v. *Brittain,* 149 Cal. App. 2d 201, 308 P. 2d 38 (1957); see *Mapp* v. *Ohio, supra,* at 659, n. 9. However, the District Court of Appeal passed on the issue of the narcotics seized in the apartment, presumably on the ground that petitioners preserved that question by their motion under § 995, California Penal Code, which was directed toward the principal objection to that search—the alleged lack of probable cause. While "[t]here can be no question as to the proper presentation of a federal claim when the highest state court passes on it," *Raley* v. *Ohio,* 360 U. S. 423, 436 (1959), there is no indication in the court's opinion that it passed on the issue of the search of the automobile, nor is there any indication in the petitioners' briefs in that court that the issue was presented.

See *Wolf* v. *Colorado,* 338 U. S. 25, 27;* cf. *Rochin* v. *California,* 342 U. S. 165; *Palko* v. *Connecticut,* 302 U. S. 319. Today this distinction in constitutional principle is abandoned. Henceforth state searches and seizures are to be judged by the same constitutional standards as apply in the federal system.

In my opinion this further extension of federal power over state criminal cases, cf. *Fay* v. *Noia,* 372 U. S. 391; *Douglas* v. *California,* 372 U. S. 353; *Draper* v. *Washington,* 372 U. S. 487—all decided only a few weeks ago, is quite uncalled for and unwise. It is uncalled for because the States generally, and more particularly California, are increasingly evidencing concern about improving their own criminal procedures, as this Court itself has recently observed on more than one occasion (see *Gideon* v. *Wainwright,* 372 U. S. 335, 345; *ante,* p. 31), and because the Fourteenth Amendment's requirements of fundamental fairness stand as a bulwark against serious local shortcomings in this field. The rule is unwise because the States, with their differing law enforcement problems, should not be put in a constitutional strait jacket, and also because the States, more likely than not, will be placed in an atmosphere of uncertainty since this Court's decisions in the realm of search and seizure are hardly notable for their predictability. Cf. *Harris* v. *United States,* 331 U. S. 145, 175–181 (Appendix to dissenting opinion of Mr. Justice Frankfurter). (The latter point is indeed forcefully illustrated by the fact that in the first application of its new constitutional rule the majority finds itself equally divided.) And if the Court is prepared to relax Fourth Amendment standards in order to avoid unduly fettering the States, this would be in

---

*\*Mapp* v. *Ohio,* 367 U. S. 643, did not purport to change the standards by which state searches and seizures were to be judged; rather it held only that the "exclusionary" rule of *Weeks* v. *United States,* 232 U. S. 383, was applicable to the States.

46

derogation of law enforcement standards in the federal system—unless the Fourth Amendment is to mean one thing for the States and something else for the Federal Government.

I can see no good coming from this constitutional adventure. In judging state searches and seizures I would continue to adhere to established Fourteenth Amendment concepts of fundamental fairness. So judging this case, I concur in the result.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE GOLDBERG join.

I join Part I of MR. JUSTICE CLARK's opinion and the holding therein that "as we said in *Mapp* . . . the Fourth Amendment 'is enforceable against . . . [the States] by the same sanction of exclusion as is used against the Federal Government,' by the application of the same constitutional standard prohibiting 'unreasonable searches and seizures.'" Only our Brother HARLAN dissents from that holding; he would judge state searches and seizures "by the more flexible concept of 'fundamental' fairness, of rights 'basic to a free society,' embraced in the Due Process Clause of the Fourteenth Amendment."

However, MR. JUSTICE CLARK, MR. JUSTICE BLACK, MR. JUSTICE STEWART and MR. JUSTICE WHITE do not believe that the federal requirement of reasonableness contained in the Fourth Amendment was violated in this case. THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS, MR. JUSTICE GOLDBERG and I have the contrary view. For even on the premise that there was probable cause by federal standards for the arrest of George Ker, the arrests of these petitioners were nevertheless illegal, because the unannounced intrusion of the arresting officers into their apartment violated the Fourth Amendment. Since the

arrests were illegal, *Mapp* v. *Ohio*, 367 U. S. 643, requires the exclusion of the evidence which was the product of the search incident to those arrests.

Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except (1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.

## I.

It was firmly established long before the adoption of the Bill of Rights that the fundamental liberty of the individual includes protection against unannounced police entries. "[T]he Fourth Amendment did but embody a principle of English liberty, a principle old, yet newly won, that finds another expression in the maxim 'every man's home is his castle.'" Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361, 365 (1921); *Frank* v. *Maryland,* 359 U. S. 360, 376–382 (dissenting opinion). As early as *Semayne's Case,* 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (1603), it was declared that "[i]n all cases when the King is party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. *But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . .*" (Emphasis supplied.) Over a century later the leading commentators upon the English criminal law affirmed the continuing vitality of

that principle. 1 Hale, Pleas of the Crown (1736), 583; see also 2 Hawkins, Pleas of the Crown (6th ed. 1787), c. 14, § 1; Foster, Crown Law (1762), 320–321.[1] Perhaps its most emphatic confirmation was supplied only 35 years before the ratification of the Bill of Rights. In *Curtis' Case,* Fost. 135, 168 Eng. Rep. 67, decided in 1756, the defendant, on trial for the murder of a Crown officer who was attempting an entry to serve an arrest warrant, pleaded that because the officer had failed adequately to announce himself and his mission before breaking the doors, forceful resistance to his entry was justified and the killing was therefore justifiable homicide. In recognizing the defense the court repeated the principle that "peace-officers, having a legal warrant to arrest for a breach of the peace, may break open doors, *after having demanded admittance and given due notice of their warrant";* the court continued that "no precise form of words is required in a case of this kind" because "[i]t is sufficient that the party hath notice, that the officer cometh not as a mere trespasser, but claiming to act under a proper authority . . . ." Fost., at 136–137, 168 Eng. Rep., at 68. (Emphasis supplied.) The principle was again confirmed not long after the Fourth Amendment became part of our Constitution. Abbott, C. J., said in *Launock* v. *Brown,* 2 B. & Ald. 592, 593–594, 106 Eng. Rep. 482, 483 (1819):

". . . I am clearly of opinion that, in the case of a misdemeanour, such previous demand is requisite . . . . It is reasonable that the law should be so; for if no

---

[1] Hale's view was representative: "A man, that arrests upon suspicion of felony, may break open doors, if the party refuse upon demand to open them . . . ." 1 Hale, Pleas of the Crown (1736), 583. See generally *Miller* v. *United States,* 357 U. S. 301, 306–310; *Accarino* v. *United States,* 85 U. S. App. D. C. 394, 398–402, 179 F. 2d 456, 460–464; Thomas, The Execution of Warrants of Arrest, [1962] Crim. L. Rev. 520, 597, 601–604.

previous demand is made, how is it possible for a party to know what the object of the person breaking open the door may be? He has a right to consider it as an aggression on his private property, which he will be justified in resisting to the utmost." [2]

The protections of individual freedom carried into the Fourth Amendment, *Boyd* v. *United States*, 116 U. S. 616, 630, undoubtedly included this firmly established requirement of an announcement by police officers of purpose and authority before breaking into an individual's home. The requirement is no mere procedural nicety or formality attendant upon the service of a warrant. Decisions in both the federal and state courts have recognized, as did the English courts, that the requirement is of the essence of the substantive protections which safeguard individual liberty.[3] The Court of Appeals for the District of Columbia Circuit has said:

"... there is no division of opinion among the learned authors ... that even where an officer may

---

[2] Compare also the statement of Bayley, J., in *Burdett* v. *Abbot*, 14 East. 1, 162–163, 104 Eng. Rep. 501, 563 (1811):

"Now in every breach of the peace the public are considered as interested, and the execution of process against the offender is the assertion of a public right: and in all such cases, I apprehend that the officer has a right to break open the outer door, provided there is a request of admission first made for the purpose, and a denial of the parties who are within."

See also *Ratcliffe* v. *Burton*, 3 Bos. & Pul. 223, 127 Eng. Rep. 123 (1802); *Kerbey* v. *Denby*, 1 M. & W. 336, 150 Eng. Rep. 463 (1836); cf. *Park* v. *Evans*, Hob. 62, 80 Eng. Rep. 211; *Penton* v. *Brown*, 1 Keble 698, 83 Eng. Rep. 1193; *Percival* v. *Stamp*, 9 Ex. 167, 156 Eng. Rep. 71 (1853).

[3] See generally *Gatewood* v. *United States*, 93 U. S. App. D. C. 226, 229, 209 F. 2d 789, 791; 1 Bishop, New Criminal Procedure (2d ed. 1913), § 201; 1 Varon, Searches, Seizures and Immunities (1961), 399–401; Day and Berkman, Search and Seizure and the Exclusionary Rule: A Re-Examination in the Wake of Mapp v. Ohio, 13 West. Res. L. Rev. 56, 79–80 (1961).

have power to break open a door without a warrant, he cannot lawfully do so unless he first notifies the occupants as to the purpose of his demand for entry." *Accarino* v. *United States,* 85 U. S. App. D. C. 394, 400, 179 F. 2d 456, 462.

Similarly, the Supreme Judicial Court of Massachusetts declared in 1852:

"The maxim of law that every man's house is his castle . . . has not the effect to restrain an officer of the law from breaking and entering a dwelling-house for the purpose of serving a criminal process upon the occupant. In such case the house of the party is no sanctuary for him, and the same may be forcibly entered by such officer after a proper notification of the purpose of the entry, and a demand upon the inmates to open the house, and a refusal by them to do so." *Barnard* v. *Bartlett,* 10 Cush. (Mass.) 501, 502–503; cf. *State* v. *Smith,* 1 N. H. 346.

Courts of the frontier States also enforced the requirement. For example, Tennessee's high court recognized that a police officer might break into a home to serve an arrest warrant only "after demand for admittance and notice of his purpose," *McCaslin* v. *McCord,* 116 Tenn. 690, 708, 94 S. W. 79, 83; cf. *Hawkins* v. *Commonwealth,* 53 Ky. 395. Indeed, a majority of the States have enacted the requirement in statutes substantially similar to California Penal Code § 844 and the federal statute, 18 U. S. C. § 3109.[4]

---

[4] Ala. Code, Tit. 15, § 155; Ariz. Rev. Stat. Ann. § 13–1411; Deering's Cal. Penal Code § 844; Fla. Stat. Ann. § 901.19 (1); Idaho Code § 19–611; Burns' Ind. Ann. Stat. § 9–1009; Iowa Code Ann. §.755.9; Kan. Gen. Stat. § 62–1819; Ky. Rev. Stat. § 70.078; Dart's La. Crim. Code, Art. 72; Mich. Stat. Ann. § 28.880; Minn. Stat. Ann. § 629.34; Miss. Code § 2471; Mo. Rev. Stat. § 544.200; Mont. Rev. Code § 94–6011; Neb. Rev. Stat. § 29–411; Nev. Rev. Stat. § 171.275; McKinney's N. Y. Crim. Code § 178; N. C. Gen. Stat. § 15–44; Page's

Moreover, in addition to carrying forward the protections already afforded by English law, the Framers also meant by the Fourth Amendment to eliminate once and for all the odious practice of searches under general warrants and writs of assistance against which English law had generally left them helpless. The colonial experience under the writs was unmistakably "fresh in the memories of those who achieved our independence and established our form of government." [5] *Boyd* v. *United States, supra,* at 625. The problem of entry under a general warrant was not, of course, exactly that of unannounced intrusion to arrest with a warrant or upon probable cause, but the two practices clearly invited common abuses. One of the grounds of James Otis' eloquent indictment of the writs bears repetition here:

> "Now one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and whilst he is quiet, he is as well

Ohio Rev. Code Ann. § 2935.15; Okla. Stat. Ann., Tit. 22, § 194; Ore. Rev. Stat. § 133.320; S. C. Code § 53–198; S. D. Code § 34.1606; Tenn. Code Ann. § 40–807; Utah Code Ann. 77–13–12; Wash. Rev. Code § 10.31.040; Wyo. Comp. Stat. § 10–309.

Compare Code of Crim. Proc., American Law Institute, Official Draft (1930), § 28:.

*"Right of officer to break into building.* An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, as provided in section 21, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose."

[5] See also *Henry* v. *United States,* 361 U. S. 98, 100–101; Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937), c. II; Barrett, Personal Rights, Property Rights, and the Fourth Amendment, 1960 Supreme Court Review 46, 70–71; Comment, Search and Seizure in the Supreme Court: Shadows on the Fourth Amendment, 28 U. of Chi. L. Rev. 664, 678–679 (1961). Compare *East-India Co.* v. *Skinner,* Comb. 342, 90 Eng. Rep. 516.

guarded as a prince in his castle. This writ, if it should be declared legal, would totally annihilate this privilege. Custom-house officers may enter our houses when they please; we are commanded to permit their entry. Their menial servants may enter, may break locks, bars, and every thing in their way: and whether they break through malice or revenge, no man, no court, can inquire. Bare suspicion without oath is sufficient." Tudor, Life of James Otis (1823), 66–67.

Similar, if not the same, dangers to individual liberty are involved in unannounced intrusions of the police into the homes of citizens. Indeed in two respects such intrusions are even more offensive to the sanctity and privacy of the home. In the first place service of the general warrants and writs of assistance was usually preceded at least by some form of notice or demand for admission. In the second place the writs of assistance by their very terms might be served only during daylight hours.[6] By significant contrast, the unannounced entry of the Ker apartment occurred after dark, and such timing appears to be common police practice, at least in California.[7]

---

[6] Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937), 54.

[7] In these two respects, the practice of unannounced police entries by night is also considerably more offensive to the rights protected by the Fourth Amendment than the use of health-inspection and other administrative powers of entry, concerning the constitutionality of which this Court has divided sharply, *Frank v. Maryland, supra; Ohio ex rel. Eaton v. Price,* 364 U. S. 263. Since my Brother CLARK does not rely upon either of those decisions, I have no occasion to discuss further the applicability of either to the case at bar. For further consideration of problems raised by those cases, see generally, Waters, Rights of Entry in Administrative Officers, 27 U. of Chi. L. Rev. 79 (1959); Comment, State Health Inspections and "Unreasonable Search": The *Frank* Exclusion of Civil Searches, 44 Minn. L. Rev. 513 (1960).

It is much too late in the day to deny that a lawful entry is as essential to vindication of the protections of the Fourth Amendment as, for example, probable cause to arrest or a search warrant for a search not incidental to an arrest. This Court settled in *Gouled* v. *United States,* 255 U. S. 298, 305–306, that a lawful entry is the indispensable predicate of a reasonable search. We held there that a search would violate the Fourth Amendment if the entry were illegal whether accomplished "by force or by an illegal threat or show of force" or "obtained by stealth instead of by force or coercion." Similarly, rigid restrictions upon unannounced entries are essential if the Fourth Amendment's prohibition against invasion of the security and privacy of the home is to have any meaning.

It is true, of course, that the only decision of this Court which forbids federal officers to arrest and search after an unannounced entry, *Miller* v. *United States,* 357 U. S. 301, did not rest upon constitutional doctrine but rather upon an exercise of this Court's supervisory powers. But that disposition in no way implied that the same result was not compelled by the Fourth Amendment. *Miller* is simply an instance of the usual practice of the Court not to decide constitutional questions when a nonconstitutional basis for decision is available. See *International Assn. of Machinists* v. *Street,* 367 U. S. 740, 749–750. The result there drew upon analogy to a federal statute, similar in its terms to § 844, with which the federal officers concededly had not complied in entering to make an arrest. Nothing we said in *Miller* so much as intimated that, without such a basis for decision, the Fourth Amendment would not have required the same result. The implication, indeed, is quite to the contrary. For the history adduced in *Miller* in support of the nonconstitutional ground persuasively demonstrates that the Fourth Amendment's protections include the security of the householder against unannounced invasions by the police.

54

## II.

The command of the Fourth Amendment reflects the lesson of history that "the breaking an outer door is, in general, so violent, obnoxious and dangerous a proceeding, that it should be adopted only in extreme cases, where an immediate arrest is requisite." 1 Burn, Justice of the Peace (28th ed. 1837), 275–276.

I have found no English decision which clearly recognizes any exception to the requirement that the police first give notice of their authority and purpose before forcibly entering a home. Exceptions were early sanctioned in American cases, *e. g., Read* v. *Case,* 4 Conn. 166, but these were rigidly and narrowly confined to situations not within the reason and spirit of the general requirement. Specifically, exceptional circumstances have been thought to exist only when, as one element, the facts surrounding the particular entry support a finding that those within actually knew or must have known of the officer's presence and purpose to seek admission. Cf. *Miller* v. *United States, supra,* at 311–313. For example, the earliest exception seems to have been that "[i]n the case of an *escape* after arrest, the officer, on fresh pursuit of the offender to a house in which he takes refuge, may break the doors to recapture him, in the case of felony, without a warrant, and without notice or demand for admission to the house of the offender." [8] Wilgus, Arrest Without a

---

[8] It is not clear whether the English law ever recognized such an exception to the requirement of notice or awareness. See, *e. g., Genner* v. *Sparks,* 6 Mod. 173, 87 Eng. Rep. 928. It is stated in an English annotator's note to *Semayne's Case, supra,* that "if a man being legally arrested, escapeth from the officer, and taketh shelter though in his own house, the officer may upon fresh suit break open doors in order to retake him, having first given due notice of his business and demanded admission, and been refused." 77 Eng. Rep., at 196. The views of other commentators are ambiguous on this point. See, *e. g.,* 2 Hawkins, Pleas of the Crown (6th ed. 1787),

Warrant, 22 Mich. L. Rev. 541, 798, 804 (1924). The rationale of such an exception is clear, and serves to underscore the consistency and the purpose of the general requirement of notice: Where such circumstances as an escape and hot pursuit by the arresting officer leave no doubt that the fleeing felon is aware of the officer's presence and purpose, pausing at the threshold to make the ordinarily requisite announcement and demand would be a superfluous act which the law does not require.[9] But no exceptions have heretofore permitted unannounced entries in the absence of such awareness on the part of the occupants—unless possibly where the officers are justified in the belief that someone within is in immediate danger of bodily harm.

Two reasons rooted in the Constitution clearly compel the courts to refuse to recognize exceptions in other situa-

---

c. 14, § 8. Blackstone's view was that "in case of felony *actually committed*, or a dangerous wounding, whereby felony is like to ensue . . . [a constable] may upon probable suspicion arrest the felon; and for that purpose is authorized (as upon a justice's warrant) to break open doors, and even to kill the felon if he cannot otherwise be taken . . . ." 4 Commentaries 292.

[9] See Professor Wilgus' comment: "Before doors are broken, there must be a necessity for so doing, and notice of the authority and purpose to make the arrest must be given and a demand and refusal of admission must be made, *unless this is already understood, or the peril would be increased*." Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 802 (1924). (Emphasis supplied.) Cf. *Accarino* v. *United States*, 85 U. S. App. D. C. 394, 398–402, 179 F. 2d 456, 460–464.

Compare Lord Mansfield's statement, in 1774, of the rationale for the requirement of announcement and demand for admission: "The ground of it is this; that otherwise the consequences would be fatal: for it would leave the family within, naked and exposed to thieves and robbers. It is much better therefore, says the law, that you should wait for another opportunity, than do an act of violence, which may probably be attended with such dangerous consequences." *Lee* v. *Gansel*, 1 Cowp. 1, 6–7, 98 Eng. Rep. 935, 938.

·tions when there is no showing that those within were or had been made aware of the officers' presence. The first is ·that any exception not requiring a showing of such awareness necessarily implies a rejection of the inviolable presumption. of ˉinnocence. The excuse for failing to knock or announce the· officer's mission where the occupants˙ are oblivious to his presence can only be an almost automatic assumption that the. suspect within will resist the officer's attempt to enter peacefully, or will frustrate the arrest by an attempt to escape, or will attempt to destroy whatever possibly incriminating evidence he may have. Such˙ assumptions do obvious violence to the presumption of innocence. Indeed, the violence is compounded by another assumption, also necessarily involved, that a suspect to whom the officer first makes known his presence will further violate the law. It need hardly be said that not every suspect is in fact guilty of the offense of which he is suspected, and that not everyone who is in fact guilty will forcibly resist arrest ·or attempt to escape or destroy evidence.[10]

_____

[10] The comment of Rooke, J., in *Ratcliffe* v. *Burton*, 3 Bos. & Pul. 223, 230, 127 Eng. Rep. 123, 127 (1802), is relevant here: "What a privilege will be allowed to sheriffs' officers if they are permitted to effect their search by violence, without making that demand which possibly will be complied with, and consequently violence be renˉdered unnecessary!" This view of the requirement of notice or awareness ˉhas its parallel in the historic English requirement that an arresting officer must give notice of his ·authority and purpose to one whom he is about to arrest. In. the absence of such notice, unless the person being arrested already knew of the officer's authority and mission, he was justified in resisting by force, and might not be charged with an additional crime if injury to the officer resulted. The origin of. this doctrine appears to be *Mackalley's Case*, 9 Co. Rep. 65b, 69a, 77 Eng. Rep. 828, 835. See also *Rex* v. *George*, [1935] 2 D. L. R. 516 (B. C. Ct. App.); *Regina* v. *Beaudette*, 118 Can. Crim. Cases 295 (Ont. Ct. App.). Compare, *e. g., People* v. *Potter*, 144 Cal. App. 2d 350, 300 P. 2d 889, in which noncompliance

The second reason is that in the absence of a showing of awareness by the occupants of the officers' presence and purpose, "loud noises" or "running" within would amount, ordinarily, at least, only to ambiguous conduct. Our decisions in related contexts have held that ambiguous conduct cannot form the basis for a belief of the officers that an escape or the destruction of evidence is being attempted. *Wong Sun* v. *United States,* 371 U. S. 471, 483–484; *Miller* v. *United States, supra,* at 311.

Beyond these constitutional considerations, practical hazards of law enforcement militate strongly against any relaxation of the requirement of awareness. First, cases of mistaken identity are surely not novel in the investigation of crime. The possibility is very real that the police may be misinformed as to the name or address of a suspect, or as to other material information. That possibility is itself a good reason for holding a tight rein against judicial approval of unannounced police entries into private homes. Innocent citizens should not suffer the shock, fright or embarrassment attendant upon an unannounced police intrusion.[11] Second, the require-

with § 844 was excused because the defendant was known to have been convicted of three previous robberies and was suspected of a fourth—though in fact, upon entering his hotel room unannounced and by means of a key obtained from the manager, the officers found the defendant in bed, with the lights off, and unarmed. The entry occurred after midnight.

[11] The importance of this consideration was aptly expressed long ago by Heath, J., in *Ratcliffe* v. *Burton,* 3 Bos. & Pul. 223, 230, 127 Eng. Rep. 123, 126–127 (1802):

"The law of England, which is founded on reason, never authorises such outrageous acts as the breaking open every door and lock in a man's house without any declaration of the authority under which it is done. Such conduct must tend to create fear and dismay, and breaches of the peace by provoking resistance. This doctrine would not only be attended with great mischief to the persons against whom process is issued, but to other persons also, since it must equally hold

**58**

ment of awareness also serves to minimize the hazards of the officers' dangerous calling. We expressly recognized in *Miller* v. *United States, supra,* at 313, n. 12, that compliance with the federal notice statute "is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder." [12] Indeed, one of the principal objectives of the English requirement of announcement of authority and purpose was to protect the arresting officers from being shot as trespassers, ". . . for if no previous demand is made, how is it possible for a party to know what the object of the person breaking open the door may be? He has a right to consider it as an aggression on his private property, which he will be justified in resisting to the utmost." *Launock* v. *Brown,* 2 B. & Ald. 592, 594, 106 Eng. Rep. 482, 483 (1819).

These compelling considerations underlie the constitutional barrier against recognition of exceptions not predicated on knowledge or awareness of the officers' presence. State and federal officers have the common obligation to respect this basic constitutional limitation upon their police activities. I reject the contention that the courts, in enforcing such respect on the part of all officers, state or federal, create serious obstacles to effective law enforcement. Federal officers have operated for five years under

---

good in cases of process upon escape, where the party has taken refuge in the house of a stranger. Shall it be said that in such case the officer may break open the outer door of a stranger's house without declaring the authority under which he acts, or making any demand of admittance? No entry from the books of pleading has been cited in support of this justification, and *Semayne's case* is a direct authority against it."

[12] See also *McDonald* v. *United States,* 335 U. S. 451, 460–461 (concurring opinion) for Mr. Justice Jackson's comment: "Many homeowners in this crime-beset city doubtless are armed. When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot."

the *Miller* rule with no discernible impairment of their ability to make effective arrests and obtain important narcotics convictions. Even if it were true that state and city police are generally less experienced or less resourceful than their federal counterparts (and the experience of the very police force involved in this case, under California's general exclusionary rule adopted judicially in 1955, goes very far toward refuting any such suggestion,[13] see *Elkins* v. *United States,* 364 U. S. 206, 220–221), the Fourth Amendment's protections against unlawful search and seizure do not contract or expand depending upon the relative experience and resourcefulness of different groups of law-enforcement officers. When we declared in *Mapp* that, because the rights of the Fourth Amendment were of no lesser dignity than those of the other liberties of the Bill of Rights absorbed in the Fourteenth, ". . . we can no longer permit . . . [them] to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend [their] . . . enjoyment," 367 U. S., at 660—I thought by these words we had laid to rest the very problems of constitutional dissonance which I fear the present case so soon revives.[14]

---

[13] See, *e. g.,* Kamisar, Public Safety v. Individual Liberties: Some "Facts" and "Theories," 53 J. Crim. L., Criminology and Police Science 171, 188–190 (1962); Rogge, Book Review, 76 Harv. L. Rev. 1516, 1522–1523 (1963).

[14] Compare Justice Traynor's recent comment:

"Nevertheless the United States Supreme Court still confronts a special new responsibility of its own. Sooner or later it must establish ground rules of unreasonableness to counter whatever local pressures there might be to spare the evidence that would spoil the exclusionary rule. Its responsibility thus to exercise a restraining influence looms as a heavy one. It is no mean task to formulate far-sighted constitutional standards of what is unreasonable that lend themselves readily to nation-wide application." Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319, 328.

## III.

I turn now to my reasons for believing that the arrests of these petitioners were illegal. My Brother CLARK apparently recognizes that the element of the Kers' prior awareness of the officers' presence was essential, or at least highly relevant, to the validity of the officers' unannounced entry into the Ker apartment, for he says, "Ker's furtive conduct in eluding them shortly before the arrest was ground for the belief that he *might well have been* expecting the police." (Emphasis supplied.) But the test under the "fresh pursuit" exception which my Brother CLARK apparently seeks to invoke depends not, of course, upon mere conjecture whether those within "might well have been" expecting the police, but upon whether there is evidence which shows that the occupants were in fact aware that the police were about to visit them. That the Kers were wholly oblivious to the officers' presence is the only possible inference on the uncontradicted facts; the "fresh pursuit" exception is therefore clearly unavailable. When the officers let themselves in with the passkey, "proceeding quietly," as my Brother CLARK says, George Ker was sitting in his living room reading a newspaper, and his wife was busy in the kitchen. The marijuana, moreover, was in full view on the top of the kitchen sink. More convincing evidence of the complete unawareness of an imminent police visit can hardly be imagined. Indeed, even the conjecture that the Kers "might well have been expecting the police" has no support in the record. That conjecture is made to rest entirely upon the unexplained U-turn made by Ker's car when the officers lost him after the rendezvous at the oil fields. But surely the U-turn must be disregarded as wholly ambiguous conduct; there is absolutely no proof that the driver of the Ker car knew that the officers were

following it. Cf. *Miller* v. *United States, supra,* at 311; *Wong Sun* v. *United States, supra,* at 483–484.

My Brother CLARK invokes chiefly, however, the exception allowing an unannounced entry when officers have reason to believe that someone within is attempting to destroy evidence. But the minimal conditions for the application of that exception are not present in this case. On the uncontradicted record, not only were the Kers completely unaware of the officers' presence, but, again on the uncontradicted record, there was absolutely no activity within the apartment to justify the officers in the belief that anyone within was attempting to destroy evidence. Plainly enough, the Kers left the marijuana in full view on top of the sink because they were wholly oblivious that the police were on their trail. My Brother CLARK recognizes that there is no evidence whatever of activity in the apartment, and is thus forced to find the requisite support for this element of the exception in the officers' testimony that, in their experience in the investigation of narcotics violations, *other* narcotics suspects had responded to police announcements by attempting to destroy evidence. Clearly such a basis for the exception fails to meet the requirements of the Fourth Amendment; if police experience in pursuing other narcotics suspects justified an unannounced police intrusion into a home, the Fourth Amendment would afford no protection at all.

The recognition of exceptions to great principles always creates, of course, the hazard that the exceptions will devour the rule. If mere police experience that some offenders have attempted to destroy contraband justifies unannounced entry in *any* case, and cures the total absence of evidence not only of awareness of the officers' presence but even of such an attempt in the *particular* case, I perceive no logical basis for distinguishing unannounced police entries into homes to make

arrests for *any* crime involving evidence of a kind which police experience indicates might be quickly destroyed or jettisoned. Moreover, if such experience, without more, completely excuses the failure of arresting officers before entry, at any hour of the day or night, either to announce their purpose at the threshold or to ascertain that the occupant already knows of their presence, then there is likewise no logical ground for distinguishing between the stealthy manner in which the entry in this case was effected, and the more violent manner usually associated with totalitarian police of breaking down the door or smashing the lock.[15]

My Brother CLARK correctly states that only when state law "is not violative of the Federal Constitution" may we defer to state law in gauging the validity of an arrest under the Fourth Amendment. Since the Cali-

---

[15] The problems raised by this case are certainly not novel in the history of law enforcement. One of the very earliest cases in this field, decided more than three centuries ago, involved facts strikingly similar to those of the instant case. The case of *Waterhouse* v. *Saltmarsh*, Hob. 263, 80 Eng. Rep. 409, arose out of the service by a sheriff and several bailiffs of execution upon a bankrupt. These officers, having entered the outer door of the house by means not described, " 'ran up to the chamber, where the plaintiff and his wife were in bed and the doors lockt, and knocking a little, without telling what they were, or wherefore they came, brake open the door and took him . . . .' " The sheriff was fined the substantial sum of £200— for what the court later described in a collateral proceeding as "the unnecessary outrage and terror of this arrest, and for not signifying that he was sheriff, that the door might have been opened without violence . . . ." Hob., at 264, 80 Eng. Rep., at 409. Compare another early case involving similar problems, *Park* v. *Evans*, Hob. 62, 80 Eng. Rep. 211, in which the Star Chamber held unlawful an entry effected by force after the entering officers had knocked but failed to identify their authority or purpose. The Star Chamber concluded that "the opening of the door was occasioned by them by craft, and then used to the violence, which they intended."

fornia law of arrest here called in question patently violates the Fourth Amendment, that law cannot constitutionally provide the basis for affirming these convictions. This is not a case of conflicting testimony pro and con the existence of the elements requisite for finding a basis for the application of the exception. I agree that we should ordinarily be constrained to accept the state fact-finder's resolution of such factual conflicts. Here, however, the facts are uncontradicted: the Kers were completely oblivious of the presence of the officers and were engaged in no activity of any kind indicating that they were attempting to destroy narcotics. Our duty then is only to decide whether the officers' testimony—that in their general experience narcotics suspects destroy evidence when forewarned of the officers' presence—satisfies the constitutional test for application of the exception. Manifestly we should hold that such testimony does not satisfy the constitutional test. The subjective judgment of the police officers cannot constitutionally be a substitute for what has always been considered a necessarily objective inquiry,[16] namely, whether circumstances exist in the *particular* case which allow an unannounced police entry.[17]

---

[16] Any doubt concerning the scope of the California test which may have survived *People* v. *Maddox*, 46 Cal. 2d 301, 294 P. 2d 6, must have been removed by the later case of *People* v. *Hammond*, 54 Cal. 2d 846, 854–855, 357 P. 2d 289, 294:

"When there is reasonable cause to make an arrest, and the facts known to the arresting officer before his entry are not inconsistent with a good faith belief on his part that compliance with the formal requirements of . . . section [844] is excused, a failure to comply therewith does not invalidate the search and seizure made as an incident to the ensuing arrest."

[17] I think it is unfortunate that this Court accepts the judgment of the intermediate California appellate court on a crucial question of California law—for it is by no means certain that the Supreme Court of California, the final arbiter of questions of California law,

We have no occasion here to decide how many of the situations in which, by the exercise of our supervisory power over the conduct of federal officers, we would exclude evidence, are also situations which would require the exclusion of evidence from state criminal proceedings under the constitutional principles extended to the States by *Mapp*. But where the conduct effecting an arrest so clearly transgresses those rights guaranteed by the Fourth Amendment as does the conduct which brought about the arrest of these petitioners, we would surely reverse the judgment if this were a federal prosecution involving federal officers. Since our decision in *Mapp* has made the guarantees of the Fourteenth Amendment coextensive with those of the Fourth we should pronounce precisely the same judgment upon the conduct of these state officers.

---

would have condoned the willingness of the District Court of Appeal to excuse noncompliance with the California statute under the facts of this case. For the view of the California Supreme Court on the scope of the exception under § 844, see, *e. g., People* v. *Martin,* 45 Cal. 2d 755, 290 P. 2d 855; *People* v. *Carswell,* 51 Cal. 2d 602, 335 P. 2d 99; *People* v. *Hammond,* 54 Cal. 2d 846, 357 P. 2d 289.

An examination of the California decisions which have excused noncompliance with § 844 reveals the narrow scope of the exceptions heretofore recognized—confined for the most part to cases in which officers entered in response to cries of a victim apparently in imminent danger, *e. g., People* v. *Roberts,* 47 Cal. 2d 374, 303 P. 2d 721; or in which they first knocked at the door, or knew they had been seen at the door, and then actually heard or observed destruction of evidence of the very crime for which they had come to arrest the occupants, see, *e. g., People* v. *Moore,* 140 Cal. App. 2d 870, 295 P. 2d 969; *People* v. *Steinberg,* 148 Cal. App. 2d 855, 307 P. 2d 634; *People* v. *Williams,* 175 Cal. App. 2d 774, 1 Cal. Rptr. 44; *People* v. *Fisher,* 184 Cal. App. 2d 308, 7 Cal. Rptr. 461. See generally, for summary and discussion of California cases involving various grounds for noncompliance with § 844, Fricke, California Criminal Evidence (5th ed. 1960), 432–433; Comment, Two Years With the *Cahan* Rule, 9 Stan. L. Rev. 515, 528–529 (1957).