## State of Vermont v. Paul W. Crepeault

[ 252 A.2d 534 ]

February Term, 1969

Present: **Holden, C.J., Shangraw, Barney, Keyser, JJ., and Larrow, Supr. J.**

Opinion Filed April 1, 1969

*Harvey B. Otterman, Jr., Esq.,* for the Petitioner.

*James M. Jeffords,* Attorney General, *Alan W. Cheever,* Assistant Attorney General and *Sten Lium,* State's Attorney, for the State.

**Barney, J.** This is a review of a post conviction proceeding held in Caledonia County Court pursuant to 13 V.S.A. §7131 *et seq.* The original conviction received regular appellate review and was affirmed in 126 Vt. 338, 229 A.2d 245. In this proceeding the lower court declined to set aside the sentence, finding it lawfully imposed and finding no denial or infringement of the respondent's constitutional rights.

Assigned counsel represented the respondent in this proceeding and briefed and argued the issues before this Court. In addition the respondent submitted his own extensive brief on matters whose consideration he wished to insure. All issues raised have been given consideration.

The respondent was convicted of first degree arson of a dwelling referred to as the Finck home. This conviction, by jury, occurred in a retrial after the first trial had, before the close of the state's case, ended in the ordering of a mistrial by the presiding judge.

In this case, the respondent first came to the attention of the authorities when the state police in St. Johnsbury received a telephone call on January 20, 1965, from a neighbor about a shooting disturbance in and around the home of the parents of the respondent. While a police car was enroute to the scene a second call came in from the parents, who had retreated to the neighbor's home, stating that the respondent had been doing the shooting in the home and that he had shot at a car in the dooryard in or near which his father had been situated. With that report a second car was dispatched.

The first car went to the neighbor's and the second car went to the Crepeault home. The trooper in the second car saw the respondent standing in the yard of the home near his car, empty-handed and engaging in no unlawful activity at the time, and, having been informed that respondent had been shooting and was dangerous, the trooper, immediately and without warrant, took the respondent into custody. A loaded shot gun was in the respondent's car.

The respondent was placed in the cruiser for some fifteen minutes, where the detective on the scene talked with him for a few minutes, but did not question him, and he was then taken to St. Johnsbury,

charged with breach of the peace by the state's attorney, and lodged in the county jail.

The state detective on the scene then talked with the respondent's father and mother, and went into their house with their permission to survey the scene. Another state police officer accompanied them, and the state officers were informed that the respondent had shot the cat, the parrot and also had shot up the TV set. The respondent, who was then 19, lived in this house with his parents.

As the group was leaving the Crepeault house, one of the officers noticed on the open back porch a sleeping bag with a name stenciled on it related to the name of the owners of a residence that had been destroyed by fire. Mr. and Mrs. Crepeault were present on the porch when the officer saw and inquired about the sleeping bag. Mrs. Crepeault said that it had been left there, along with some blankets, by a friend of her son's named Blainey.

At the time of this discovery the officers were present at the invitation and with the consent of Mr. and Mrs. Crepeault, had no warrant for the arrest of the respondent and had no search warrant. At that time they were not making any inquiry or search about the Finck fire. With the permission of Mrs. Crepeault the officer took the sleeping bag and blankets into possession.

On the following day, January 28, the officers went to the Blainey home and made inquiry. The boy was a minor fourteen years of age, and the questioning was carried on with the consent of his mother. From him the officers learned of the involvement of the respondent, with accomplices, in setting of the Finck fire. On subsequent days other articles were obtained from the Crepeault house.

On January 29 the respondent was brought before the then Caledonia Municipal Court on the pending breach of the peace charge, where his minority was noted and he was ordered returned to the county jail pending appointment of counsel, which occurred that very day. Until this remand to jail he had not been questioned relative to the Finck fire.

On January 29, while at the jail and without counsel, the respondent (still a minor) was questioned by a representative of the state fire marshal's office and a state police officer about the Finck fire. The interrogation was apparently fairly prolonged, and resulted in the taking of a statement about the Finck fire and other misconduct. The respondent was not informed of his constitutional rights prior to any

of this. This written statement was never introduced in evidence either at the trial or at the hearing on this petition. The involvement of the respondent and of the other participants was known to the officers from the Blainey interview of January 28, and was not the result of this questioning.

On February 1 the respondent pleaded not guilty and not guilty by reason of insanity to the breach of the peace charge. He was then committed to the state hospital for observation and subsequently returned to custody, having been found sane. On March 1 he was charged, by state's attorney's information, with the crime of first degree arson and arrested on a capias issuing out of Caledonia Court. The history of the breach of peace proceedings hereafter no longer concerns this proceeding, and this matter is reported in *In re Crepeault*, 125 Vt. 360, 215 A.2d 524.

The arson charge came to trial in the June Term, 1965, of Caledonia County Court. The respondent was represented by counsel and a guardian *ad litem* had been appointed. A notice of alibi was filed prior to this trial. During the presentation of the state's case, before the time for the respondent's evidence was reached, a mistrial was ordered. The respondent was not discharged and the case was later tried at the December Term of that court.

The trial resulted in the conviction of the respondent of first degree arson. The respondent did not testify and no statements of any nature made by him were introduced in evidence. The sleeping bag and other articles found at the Crepeault home were not introduced into evidence at either trial.

At the second trial, at the close of the state's case, the respondent's counsel moved for a directed verdict of not guilty. Upon denial of that motion the case went to the jury on the basis of the state's case, without evidence from the respondent. The choice of testifying or not was left to the respondent after the consequences of either choice had been discussed and explained to him by his attorney. The alibi witnesses exhibited reluctance to testify, and, after interviewing them, it was the conclusion of respondent's counsel that their testimony would not be helpful to the respondent or maintain the alibi. For these reasons, and the related ethical considerations, the respondent's counsel decided against using these witnesses. Although the respondent now disputes this, it was the lower court's finding that, at the time, the respondent agreed with the decision to not call the alibi witnesses.

Another factor influencing counsel's decision that it was best to rest at the close of the state's case related to the written statement taken by the officers from the respondent at the county jail before counsel was assigned. Although the attorney realized that the admissibility of the statement was subject to a prior hearing on that issue, he had in mind the possibility that it might be available as an impeaching statement. The respondent himself had not offered any defense to the charges to his attorney. The findings draw what appears to be a justifiable inference that the statement, not in evidence, contained incriminating matter connected to the charge. It should also be noted that counsel felt that the evidence of the state was not legally sufficient to support the conviction, as he argued in *State* v. *Crepeault,* 126 Vt. 338, 339, 229 A.2d 245.

In his own brief, the respondent makes certain contentions based on the mistrial. He argues since the first trial was set aside it was necessary to start all over with a new arrest, a new information by the state's attorney then in office and new evidence. This is, of course, based on a misconception of the mistrial ruling. This is a discretionary decision by the trial court that the proceedings already had before the jury had suffered some error or prejudice making a fair trial impossible. The order does not necessarily dismiss the action or discharge the respondent and did not do so here. It merely declared the trial itself, insofar as already held, a nullity, and ordered the case to be reheard before a new jury. 23A C.J.S. Criminal Law §1384(b). This is in accord with usual practice in our courts and not error. Since the new state's attorney proceeded under the same unamended information, as the findings report, he was not required to add his oath to it to insure its continued validity. *State* v. *Snyder,* 123 Vt. 367, 368, 189 A.2d 535.

The respondent raises a related question in his claim that the introduction of the same evidence in his second trial as was used in his first subjected him to double jeopardy. In this State it is the law that it is only a valid judgment that bars a subsequent prosecution for the same offense. *State* v. *Frotten,* 114 Vt. 410, 416-417, 46 A.2d 921; *State* v. *Persons,* 117 Vt. 556, 558, 96 A.2d 818. Thus, as our law stands, the respondent has not been twice in jeopardy.

In the respondent's brief he brings up the claim of failure to properly establish probable cause in justification of the issuance

of criminal process. This issue has been determined adversely to the respondent's position in a number of recent cases, and is not now to be overturned. *In re Morris,* 126 Vt. 297, 229, A.2d 244.

■ The remaining issues, or aspects of them, are all raised by the brief submitted by counsel in this Court, as well as being included, in varying form, in the briefs of the respondent. The first of these is the issue of illegal arrest. This relates to the arrest in connection with the breach of peace, since the arrest on the arson charge is not attacked as in any way irregular. We treat the point not because there is any question of the regularity of the jurisdiction acquired for trying the respondent for arson, but because the respondent argues that the claimed irregular arrest was one considerable aspect of his treatment that resulted in what he says is prejudice to the point of invalidating the proceedings.

The report reaching the officers and precipitating the arrest was one of a shooting affray during which a shot or shots were apparently deliberately directed in the direction of a person. This is the kind of circumstance that requires prompt enforcement action. Law officers are empowered to arrest without warrant where they have reason to believe a felony has been committed. *In re Huard,* 125 Vt. 189, 191, 212 A.2d 640. They are not required to dwell on the niceties of whether the episode is in fact the felony of assault with intent to kill, 13 V.S.A. §601, or the misdemeanor of intentionally aiming and discharging a firearm at another. 13 V.S.A. §4011. As custodians of the peace they are expected and empowered to act to protect citizens from violent harm. Furthermore, in *State* v. *Mancini,* 91 Vt. 507, 510, 101 A. 581, it is suggested that in some circumstances an officer may arrest without warrant to prevent a breach of the peace. Where the difference in consequence between a felony and misdemeanor may depend entirely on the subjective purpose of that possessor of a gun, it would appear to be within one of those circumstances where the officer should act to forestall what may, or may not, eventuate as merely a breach of the peace. The arrest has not been shown to be unlawful.

■ The respondent complains that there was an illegal search and consequent seizure of evidence that turned out to be incriminating from the house in which he lived with his parents. The findings declare that there was no search. In point of law, this is so. The officers were on the premises with the consent and at the invitation of Mr. and Mrs.

Crepeault. The discovery of evidence relating to the Finck fire was shown to be unexpected and unpremeditated. It was in plain view at a place where the officers properly were. *Ker* v. *California,* 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726, says this is not a search such as is prohibited by the Fourth Amendment.

■ The next issue is far more serious. The respondent complains of the interrogation that took place at the county jail where he had been recommitted to await the as yet unaccomplished assignment of counsel. He was then a minor. He was given no advice as to his rights and constitutional protections. In view of the information the officers had already obtained from the Blainey interview, there was no question but that the investigation had focused on the respondent as a prime suspect in the Finck fire. The fact that the rule of *Escobedo* v. *Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 was avoided by not using the statement obtained from the respondent as evidence in the actual trial does not lessen this Court's disapproval of the practices used. This disapproval does not mean that there was a fatal defect, therefore, in the proceedings. It does mean that although these improper methods are without consequence with respect to action on this petition, there may well be occasions when the same actions might jeopardize or invalidate a criminal prosecution.

This argument is, indeed, made in this very case, on the basis that the existence of this statement, inadmissible though it was, operated to deter testimony by the respondent. We cannot help a respondent in such a dilemma. Preventing the admission of an improperly obtained statement is as far as this Court can go with respect to assisting in the decision to take the stand or not. The considerations are personal to the respondent, involving the truth of his proposed testimony and the possible exposure of his history. He had the advice of counsel, and together they made the decision after full discussion, a decision by which they must be bound if proceedings are ever to come to a final determination.

■ It is the function and duty of the courts to protect the lawful rights of those accused so that they may be fairly tried. It is not the function of the courts to suppress the truth or override the interests of law-abiding citizens if there is no constitutional requirement that does so. That there are duties owed the peaceful members of society and limits to judicial protection of accused is well set out in *State* v.

*Gerardo,* 53 N.J. 261, 250 A.2d 130, 131. The tainted evidence was neither offered not utilized as a source of material in aid of conviction. This is the scope of the laws protection. The presentation of his case is the respondent's responsibility.

■ The respondent makes a point of the fact that the alibi witnesses were never called to testify. The findings clearly show that this was his wish. This is perhaps enough to settle the point, but it also clearly appears that, in the judgment of his counsel, their testimony would not have helped him and would not have supported the alibi claimed. If this is so, and there is no evidence to the contrary, the respondent has no grounds for complaint.

*The order denying the petition is affirmed.*