**William D. HENSLEY and Goldie James Kaulaity, Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–16541.**

Court of Criminal Appeals of Oklahoma.

Nov. 1, 1972.

Rehearing Denied Nov. 17, 1972.

Virgil L. Upchurch, Anadarko, for appellants.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellants, William D. Hensley and Goldie James Kaulaity, hereinafter referred to as Defendant Hensley and Defendant Kaulaity, were charged, tried and convicted in the District Court of Caddo County, Oklahoma, for the offense of Burglary in the Second Degree; their punishment was fixed at two (2) years imprisonment, and from said judgments and sentences, a timely appeal has been perfected to this Court.

At the trial, Zoral Young testified that he owned and operated a well service business located on the east edge of Cement, Oklahoma. On January 26, 1970 he locked all the doors to the office building when he left at approximately 5:30 p. m. When he arrived there the following morning, he found that a glass window on the back door of the building had been shattered. He discovered that a television set, five tires, two flashlights and an American flag were missing from within the building. He observed two sets of footprints leading directly away from the building.

Gentry Burns testified that he was employed as the City Marshal of Cement and assisted in the investigation at the scene. After ascertaining that the building had been burglarized, he called the Sheriff's office for assistance.

Deputy Sheriff Taylor testified that he arrived at the Young Well Service building at approximately 8:15 a. m. In investigating the scene, he discovered two fresh sets of footprints. One set of footprints appeared to have been made by a tennis shoe or basketball type shoe. The other set appeared to have been made by a regular kind of shoe. Plaster of Paris casts of the footprints were made and introduced into evidence. He and Deputy Givens followed the two sets of footprints across several fields and down several roads. After some distance, Deputy Givens left

and Taylor continued following the tracks. On three occasions, he observed impressions where the tires had been placed on the ground. He continued to follow the tracks across a grassy field which lead up to the crest of a hill. Upon reaching the crest of the hill, he observed Defendant Hensley's house approximately one-half mile away. Because of the open country between the hill and the Defendant Hensley's house, he decided to obtain the assistance of other officers. He returned to a county road just west of the house. Upon the arrival of the other officers, they formulated a plan to surround the house. When the other officers were in position, he got out of his car and walked up to the front porch of the house. He observed tracks near the porch that looked like the footprints that he had been following earlier. He knocked at the front door and no one responded. He then looked through the glass window in the door and saw smoke coming from the kitchen into the living room. The door was locked and he raised a widow and entered the house. He searched for the smoke and found that it was still coming from around the burner of the kitchen stove, which had been turned off. He opened the back door to let other officers in and then went up the stairway. He observed a skillet with some meat in it, still hot and smoking, setting at the head of the stairs. Both defendants were found hiding in the attic of the house. They took the defendants downstairs, handcuffed them and, while transporting them to jail, seized their shoes as evidence. Later that afternoon, he and other law enforcement officers followed tracks from the Defendant Hensley's house to a pasture located not over half a mile from Defendant Hensley's house. There they found the five tires, a television set, two flashlights and an American flag, all of which were on the ground.

Officer McMillen testified that he assisted in the apprehension of the defendants. He followed Deputy Taylor's vehicle and approached the house from the south side. Upon hearing sounds of someone moving

inside the house, he went to the front of the house and told Deputy Taylor about the noise. His testimony thereafter did not differ substantially from that of the witness, Taylor.

Deputy Givens testified that he assisted in the investigation and apprehension of the defendants. His testimony did not differ substantially from that of Deputy Taylor.

Defendant Kaulaity testified that on the evening in question, he and Defendant Hensley started drinking at Hensley's house at approximately 6:30 p. m. To the best of his memory, they stopped drinking somewhere around midnight and he was then drunk. The next thing he remembered was Defendant Hensley waking him up at approximately 10:30 the next morning. He testified that Defendant Hensley came running upstairs and said, " 'The law is coming.' " (Tr. 114) He hid in the attic because he was AWOL from the Army.

Defendant Hensley testified that he and Defendant Kaulaity drank until about midnight. The next thing he remembered was waking up about 8:30 the next morning. He went downstairs to cook breakfast and observed the officers start coming toward the house. He grabbed the pan and ran upstairs. He woke up Goldie and they hid in the attic because they were both AWOL. He testified that he did not remember leaving the house although he did not know exactly what happened between midnight until 8:30 the following morning.

■ The first proposition asserts that the trial court erred in overruling defendants' motion to quash and motion to suppress the evidence obtained as a result of an illegal arrest and search. Defendants first argue that Deputy Taylor did not have reasonable cause to believe that the defendants committed the burglary. We are of the opinion that Deputy Taylor did have reason to believe that the defendants had committed a felony. He followed the footprints from the scene of the crime up to a crest of a hill overlooking Defendant Hensley's house. Upon arriving at Defendant Hensley's house, he observed the same footprints near the porch area.

■ The defendants next argue under this proposition that Deputy Taylor did not announce his office and purpose as required by law. In dealing with a similar proposition in the recent case of Hopkins v. State, Okl.Cr., 500 P.2d 579, we stated: " * * * In the instant case, Officer Morris had personal knowledge that a felony had in fact been committed and had reasonable cause to believe that the defendant and Byrne had committed the same. We are of the opinion that when the officers knocked on the door, heard footsteps running through the house, and no one answered the door within several minutes, that such 'exigent circumstances' existed to allow the officers to lawfully enter without the normally required announcement of their office and purpose. Having decided that the defendant's arrest was lawful, we further hold that the seizure of the screwdriver which was laying in open view on the bed in the room where the defendant was arrested was likewise lawful." See Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726.

We thus conclude that the arrest was lawful and the taking of the defendants' shoes was likewise lawful.

■ The second proposition contends that the court erred in admitting improper and prejudicial evidence over objections of the defendants. Defendants specifically argue that the following prejudicial question was asked of the Witness C. W. Taylor:

"[By Mr. Humphrey] Q. Did you know, Mr. Taylor, what was William D. Hensley's status with the Marine Corp [sic] on January 26th and 27th?

"A. He was AWOL from the Marine Corps." (Tr. 88)

We need only observe that on cross-examination the defendants' attorney asked the following question of the Witness Taylor:

"Q. At the time that this purportedly occurred on or about January 26th and

January 27th, 1970 when you conducted your investigation, did you at that time know that Billy Hensley was in the Marine Corps and had been in the Marine Corps for over a year?" (Tr. 84)

Defendants state in their brief that the purpose of his question was to show that Witness Taylor did not know that Defendant Hensley was home at the time. The Attorney General correctly argues that the State could properly ask, on re-direct examination, the question for the purpose of showing that Deputy Taylor did know that the defendant was at home and not at his duty station. We further observe that Defendant Hensley subsequently testified on direct examination that he was AWOL from the Marine Corps. We therefore find this proposition to be without merit.

■ The final proposition asserts that the District Attorney erred in repeatedly asking incompetent questions which prejudiced the defendants. We have carefully examined each of the alleged improper questions and observe that on each occasion the trial court sustained an objection to the question. In Driver v. State, Okl. Cr., 490 P.2d 1109, we stated:

"* * * The prosecuting attorney, on cross-examination of the character witness, Ellen Whitten, asked the witness, 'What kind of guns does your son-in-law own?' (Tr. 84) Defendant objected to the question, and the same was sustained by the trial court. Defendant argues that, although the objection was sustained, the damage was done by the mere asking, and that the prejudice created was too great to overcome. In Melot v. State, Okl.Cr., 375 P.2d 343, we quoted from the fifth syllabus of Johnson v. State, 95 Okl.Cr. 1, 237 P.2d 909:

' "Where the guilt of the defendant is clear and there is no reason to believe that the jury could arrive at any other verdict but guilty the court will not reverse a case because of improper conduct of the county attorney." ' "

Although we are of the opinion that the question concerning the type of discharge the defendants received was improper, we do not deem the same to be fundamental error in view of the overwhelming evidence of the defendants' guilt and that the minimum sentence was imposed.

The judgments and sentences are affirmed.

BRETT, J., concurs.