LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a judgment of conviction and sentence on defendant’s plea of guilty to an indictment charging in pertinent part that David Reeves “did unlawfully, willfully, feloniously and knowingly sell, manufacture, deliver or bring into the State of Alabama, or have in his possession in excess of one kilo or 2.2 pounds of canni-bas [1] contrary to the provisions of Section 20-2-80 of the Code of Alabama.”
Defendant had first entered a plea of not guilty, but before the trial of the case commenced he obtained a hearing on his motion to suppress the cannabis, which motion contained two grounds only. The first ground alleged that the contraband was “the product of an unlawful search and seizure,” while the second ground stated that there was “no probable cause upon which to base a search of defendant’s home from which the cannabis was taken” and where defendant was at the time it was taken. Upon submission of the motion to suppress, it was denied by the trial court. There was then plea bargaining between counsel for the parties that resulted in an understanding among all concerned that defendant could appeal from the judgment of conviction and sentence without prejudice to his right to review a denial of his motion to suppress.
By the first issue presented in brief of counsel for appellant, he urges that in the execution of the search warrant the officer executing it failed to comply with Code of Alabama 1975, § 15-5-9, which provides:
“To execute a search warrant, an officer may break open any door or window of a house, any part of a house or anything therein if after notice of his authority and purpose he is refused admittance.”
The only testimony taken on the motion to suppress was that of three law enforcement officers, who testified on call of the State. One of them was not in the area of the execution of the search warrant; another was “about three quarters of a block” away from the house to be searched at the time the third entered the front door of the house at about 6:15 P.M., about thirty or forty minutes before sunset. The officer who actually executed the warrant was Officer Charles G. West, who at the time was an officer of the Alabama Department of Public Safety. We quote from some of his lengthy testimony as follows:
“Q. ... What responsibilities were you given?
“A. To take a copy of the search warrant with Officer Dotson with the Montgomery Police Department, to go the residence and get Mr. Reeves to the door.
“Q. Who gave you the search warrant?
“A. Deputy Mills.

“Q. All right. When you approached— when you got to Fourteen Houster Street with Officer Dotson, tell me what happened.
“A. I exited my vehicle. Officer . Dotson stayed in it. There was a white male outside of the house. I asked him if Mr. Reeves was at home and he said he was. At that time, the white male went in the house and I went to the front door.
“Q. Did he go in the front door as well?
“A. No, sir. It was a side door or back door.
“Q. Did you recognize this white male?
“A. No, sir.

“Q. As you were approaching the house, tell me what happened.
“A. I went to the front door. The main door was open. The screen door was *1300 closed. Mrs. Reeves [afterwards he changed the name to ‘Mrs. Crouse’] was inside and I asked her, you know, if David was at home and if he would come to the door. She said he was.
“Q. When you say Mrs. Reeves, who is that you are speaking about?
“A. Mrs. Crouse. (Indicating).
“Q. This lady right here with the red hair?
“A. Yes, sir.
“Q. She is the one who came to the door you spoke with?
“A. Yes, sir.
“Q. Okay. Go ahead.
“A. I asked her twice about Mr. Reeves, and she said he was coming. I waited there two or three minutes. He did not come to the door.

“Q. All right. Go ahead.
“A. I pulled the screen door open and I identified ...
“Q. Before you go further, at the point in time when you were on the outside and she is on the inside and you are asking for Reeves and she is saying he is coming, tell me any other conversation that is taking place at this time between you two, if any?
“A. None.

“Q. Okay. So you have made several requests and nothing has happened. It has been three or four minutes. Tell me what happened next.
“A. I opened the screen door.
“Q. When you say you opened the screen door, was it locked in any form or fashion?
“A. No, sir.
“Q. So the front door was open?
“A. The screen door was shut but was not locked. Yes, sir.
“Q. Tell me what happened next when you opened the screen door?
“A. I took my badge from my pocket and also the search warrant, opened the badge and I told them who I was.
“Q. Tell me exactly what you said, if you remember.
“A. Told them, I am Charles West, Department of Public Safety and had a search warrant for the house.
“Q. While you were saying these words, what, if anything, is in your hands?
“A. I had my badge in my right hand and search warrant in my left.
“Q. Who can see you and hear you when you are saying and doing these things?
“A. The three people in the residence.
“Q. Specifically, this lady right here? (Indicating.)
“A. Yes, sir.
“Q. Mrs. Crouse?
“A. Yes, sir.
“Q. And the white female and the white male that were sitting on the couch?
“A. Yes, sir. Well, they were sitting at a dining room table, kitchen table.
“Q. Excuse me. All right. Once you had entered the residence, shown your badge and warrant, tell me what you did next.
“A. The badge and warrant were shown before I entered the residence. I walked in and at that time ...
“Q. Before you entered the residence, the badge and warrant were shown on the outside of the screen door?
“A. Yes, sir. I just pulled the screen door open and stepped to the side in the doorway to where she could see it.
“Q. So you were in the doorway as you were showing the badge and warrant?
“A. Yes, sir.
“Q. I assume you had to pull the screen door out this way?
“A. Yes, sir.
“Q. All right. Go ahead.
“A. I walked in, looked down the hallway, Mr. Reeves was going into the bathroom. I told him I was a police officer and he went on in the bathroom. I laid the warrant on a table there and then went to the bathroom and got Mr. *1301 Reeves and brought him back to the living room.
“Q. Once you had gone to the bathroom and secured Mr. Reeves, tell me what happened next?
“A. Well, Officer Dotson came in the house, and just a couple of minutes later, the rest of the officers arrived.”
On cross-examination, Officer West testified in part as follows: ■
“Q. And before you opened the door, the screen door, you say that it is not locked?
“A. Yes, sir.
“Q. Did you — how did you open it?
“A. Just by the hand, pulled it open.
“Q. There was no latch on it, whatsoever?
“A. No, sir.
“Q. Did you push in before you pulled out?
“A. No, sir.
“Q. Did you say that you announced who you were before you opened the door?
“A. No, sir.
“Q. Did you — when did you announce who you were?
“A. When I pulled the screen door open and stood in the doorway where they could see me.

“Q. Detective West, when you came in the door, at any point did Mrs. Reeves— excuse me — Mrs. Crouse or any other people there ask you if you had a search warrant?
“A. No, sir.
“Q. Did you at any point ever tell them it is on the way, do not worry about it?
“A. No, sir.
“Q. You state that you were standing at the screen door, the door was open. Is this a solid screen door? Is it part wood and part screen, or can you describe the door?
“A. I believe the top part was screen. There was, I believe, a piece of wood across the middle.
“Q. Standing at the front door did you have any trouble observing the people inside?
“A. No, sir.
“Q. You could see all their actions?
“A. Yes, sir.”
In support of his contention that the trial court should have granted defendant’s motion to suppress, appellant’s attorney relies heavily upon Ex parte Gannaway, 448 So.2d 413 (Ala.1984), in which the Alabama Supreme Court reversed this Court in its upholding the action of the officers in executing the search warrant at the residence of the defendant-appellant. Appellant’s attorney states that “We have here a situation extremely similar to that encountered in Ex parte Gannaway” and that facts in the instant case are “almost identical to Gannaway.” Appellant’s attorney further argues:
“A possible rebuttal to this would appear to be that the State may allege that the simple opening of the door and stepping into the door way is not, in fact, a forced entry sufficient to invoke the sanctions of Ex parte Gannaway, supra. It is defendant’s contention that the United States Supreme Court has previously addressed a similar issue and held that such contention is inadequate. As is well known the United States Supreme Court has held that standards for determining whether certain police activity violates the Fourth Amendment as to unreasonable search and seizure are the same for both Federal and State law enforcement officers. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Then in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), the Court set forth such standards. As part of the Sabbath opinion the Court held that a forced entry includes not only the case in which officers use actual force, but also includes a case in which they ‘force open a chained lock on a partially opened door, open a locked door by using a pass key, or ... open a closed but unlocked door.’ Thus, by applying this standard it would appear that *1302 the simple opening of the screen door, even without stepping into the doorway, is considered a forced entry and subject to all of the requisites of Section 15-5-9, supra.”
It is clear to us that the facts in the instant case are in many respects similar to the facts in Gannaway. If they were precisely the same, we would follow and apply what was held by the Alabama Supreme Court in Gannaway. That the decision in Gannaway was a close one is indicated by the fact that it represents a five-to-four opinion of the justices. We will endeavor to decide the issue in this case without augmentation or diminution of what was held in Gannaway.
In our opinion, Officer West fully complied with his duty as an officer in executing the valid search warrant he had in his hand for the search of the house in which the cannabis was found. In attempting to show that the officer made “a forced entry” into the house of appellant, counsel for appellant relies upon Sabbath v. United States, supra, in which it was stated in effect that a forced entry included a case in which the force was to “open a chain lock on a partially opened door, open a locked door by using a pass key, or ... open a closed but unlocked door.” The action of the officer in the instant case falls far short of the illustrations given in Sabbath v. United States. Furthermore, the door that was partly opened by Officer West was not a door to the house of defendant’s residence but a door to the front porch of defendant’s residence, a porch that was screened in for the obvious purpose of keeping insects off and out of the porch. The word porch has been variously defined, and unabridged dictionaries tend to verbosity in their definition of the word. One of the most reliable of English dictionaries, the American Heritage Dictionary, affords us this compact definition:
“1. A covered platform, usually having a separate roof, at an entrance to a house.
“2. An open or enclosed gallery or room attached to the outside of a building; verandah.
“3. Obsolete. A portico or covered walk.”
We realize that what is sometimes referred to as a porch has been so constructed as to make of it a room of the house or has been convereted into such a room, as for instance, a bedroom, but there is nothing to indicate that such was the nature of the porch in the instant case. The evidence in the case shows that it was not a part of the inside of the house, that the door to the porch was not a door to the interior of the house, and that in order for one to obtain entrance to the house from the yard or the sidewalk in front of the house, he must cross the floor of the porch.
The record in the case now under consideration discloses that the trial judge who ruled on the motion to suppress was well aware of the identity of Mrs. Crouse, the female to whom Officer West talked as he entered the doorway to the porch and as he was in the process of moving to and through the front door of the house. Her presence at the hearing of the motion to suppress as shown by some of the testimony of Officer West as quoted above is explained by some of the record in this case, wherein it is shown that she is Debra Lynn Crouse in Case No. CC-82-1796, who filed a MOTION TO ALLOW A JOINT APPEAL with the appeal in the instant case. We are unable to agree with counsel for appellant as to the first issue presented in his brief, by which he contends that Officer West failed to comply with Code of Alabama 1975, § 15-5-9.
By the only other issue presented in appellant’s brief, he continues to charge prejudicial error in the denial by the trial court of defendant’s Motion to Suppress. He bases the contention this time upon the asserted “failure of the officers to comply with” the provisions of Code of Alabama 1975, § 15-5-7, which provides:
“A search warrant may be executed by any one of the officers to whom it is directed, but by no other person except *1303 in aid of such officer at his request, he being present and acting in its execution.”
According to the undisputed evidence, the search warrant under consideration was directed to the sheriff of Montgomery County. According to the testimony of Officer West, who actually executed the warrant, he was not a deputy sheriff of Montgomery County, but was an officer of the State of Alabama, Department of Public Safety and Narcotics. Nevertheless, the evidence shows that a deputy sheriff of Montgomery County, Officer William H. Mills, took part in the execution of the warrant, as shown by the following part of his testimony:
“A. We were called over the radio and told to meet a City unit at the Coliseum Boulevard Shopping Center which is the old A&P which they gave us the original search warrant and a copy.

“Q. So you have made the decision that Officer West is going to approach the door. Can you tell me what other decisions were made at the Coliseum meeting in regards to how the search was going to be conducted?
“A. Other than went over the raid plan, and we decided that — what we would do is wait down the street. We sent another police officer with West who was in plain clothes which was I.T. Dotson and he was to stay with the car. And then as soon as they got the door open and saw the Defendant, you know, got the Defendant and knew that we could get in safely, he was to give us the signal and we was to come in.
“Q. Once you proceeded to Fourteen Houster and Officer West and Dotson were in position and Officer West was approaching the door, what was your location at this time?
“A. We were approximately three-quarters of a block down the street. There was about four or five units, including us and the city.
“Q. Was Officer West and Officer Dotson acting under your direction or were they not?
“A. They were.
“Q. Could you tell me Sheriff Mills, what the lighting was, the outside condition was at the time the warrant was served?
“A. It was still daylight.
“Q. It was still daylight?
“A. Yes, sir.
“Q. Do you remember what time it was that you served the warrant?
“A. Yes, sir. Entry was gained at 6:15 P.M.

“Q. Tell me what happened — you say Officer Dotson was supposed to inform you to come on down?
“A. Yes, sir.
“Q. Did he in fact do that?
“A. Yes, sir. He waved at us and we came on down.
“Q. So entry was made. Were the individuals in the house?
“A. Yes, sir.
“Q. And were they searched?
“A. Yes, sir.
“Q. And was contraband found?
“A. Yes, sir.

“Q. Did you have an occasion to return that warrant to Judge Miller?
“A. Yes, sir. It was returned on the sixteenth of September.
“Q. That is within twenty-four hours of the day it was served?
“A. Yes, sir.

“Q. When you arrived into Fourteen Houster, when you personally entered the residence, what was the situation?
“A. When I arrived, Officer West was struggling with David Reeves. He had both hands behind him and they were struggling. He was trying to get him under control and handcuffed.
“Q. Was he subsequently secured and the situation brought under control?
“A. Yes, sir.
*1304 “Q. Did you have an occasion to — you say, if I understand your testimony correctly, you had the original warrant?
“A. Yes, sir.
“Q. And Officer West had a copy?
“A. Yes.
“Q. Did you have an occasion to confront either of these two individuals with a warrant?
“A. Yes, sir. The copy of the search warrant, I cannot remember whether it was on the coffee table or lying on the floor.
“Q. When you say copy ...
“A. Once Officer West entered the residence, he had given the copy to the Defendant when he entered. It is common procedure that you serve them with a copy of it, not the affidavit, but just of the search warrant itself, and you tell them that is by what authority you are in there.
“Q. When you entered the building, you say you said the search warrant, you think, you are not sure, was on the coffee table?
“A. I cannot remember whether it was on the coffee table or on the floor.
“Q. Did you have an occasion to pick it up and present it to the individual?
“A. I picked it up, and I believe David Reeves was sitting on the couch, and I told him, you know, that was a copy of the search warrant that we had that was signed by a judge that gives us the authority to search the house.”
We think that the foregoing quotations from the testimony of Deputy Sheriff Mills are sufficient to show that the execution of the search warrant is not subject to either part of the double-barrelled attack upon it in the brief of counsel for appellant. We do not agree with the contention “that Officer West was not acting at the direction of Deputy Mills when he effected entry into the residence of David Reeves,” nor do we agree with the contention that “the entry by Officer West” was not in the presence of Deputy Mills. We conclude that Deputy Mills was “present” at the execution of the warrant, having in mind the first paragraph of the definition of present as contained in Webster’s New International Dictionary, 2nd ed.:
“Being before, in view, or at hand; being within reach, sight, or call, or within certain contemplated limits; being in a certain place and not elsewhere; — opposed to absent.”
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.

. Incorrect spelling for cannabis.