**UNITED STATES of America**

v.

**Charles Frank WILLIAMS.**

**No. 91–186–Cr–J–16.**

United States District Court, M.D. Florida, Jacksonville Division.

Dec. 11, 1991.

---

William R. Mitchelson, Jr., Asst. U.S. Atty., Jacksonville, Fla., for plaintiff.

J. James Allen, Rodney Gregory, Jacksonville, Fla., for defendant.

## ORDER

JOHN H. MOORE, II, District Judge.

This cause is before the Court on Defendant Williams's motion to suppress, filed November 4, 1991; and, the Report and Recommendation of the United States Magistrate Judge, filed November 26, 1991. In the Report, the Magistrate Judge recommended that Defendant's motion to suppress be granted. The government objected to the Report and Recommendation on

December 4, 1991. Defendant's response was filed December 9, 1991. After conducting a *de novo* review of the Report and the findings and recommendations to which objection has been made, the Court will reject the Report and Recommendation to the extent inconsistent with this opinion. For the reasons set forth below, Defendant's motion to suppress will be denied.

## I. Background

The magistrate made the following factual findings in his Report. Deputy Sam Brewer of the Suwannee County Sheriff's Department was on duty patrolling Interstate 10 in Suwannee County on August 22, 1991. *See* Report at 2. Brewer encountered a Ford Bronco with no license plate, with a cardboard placard taped to the rear window which stated "LOST TAG". *See* U.S. exhibit 1 (hereinafter "ex. 1"). At 3:51 p.m., Brewer stopped the vehicle to investigate the missing license plate. *See* Report at 2.

Upon approaching the driver's side of the Bronco, Brewer requested and obtained the driver's licenses of both the driver (Defendant Edmond) and the passenger (Defendant Williams). *Id.* According to the magistrate, Brewer asked what happened to the vehicle tag and where they were going. *Id.* Brewer then returned to his patrol car to check each Defendant's identification. Brewer discovered through the check of Williams's identification that Williams had a substantial criminal history, including felony drug and firearms offenses. *Id.* at 6. A second officer, Deputy Feagle, came upon the scene and requested that Edmond exit the vehicle and stand in front of the patrol car. Feagle then went to the passenger side of the Ford Bronco and apparently engaged Williams in conversation. *Id.* at 2.

Brewer finished checking the licenses, exited his vehicle, and issued a warning citation to Edmond for the missing tag. *Id.* According to the magistrate, this took place at approximately 4:11 p.m. Edmond signed the warning citation and returned to the truck, whereupon Brewer asked Williams to exit the vehicle. *Id.* Williams walked back to the rear of the Ford Bronco, in front of the patrol car. *Id.* Brewer told Williams about the warning citation and advised him of his responsibility as owner of the vehicle to obtain a license plate. *Id.* According to the magistrate, Brewer also told Williams that any other officer could stop him down the road and issue a real ticket for the missing license plate. *Id.* at 3.

Brewer asked Williams again about the tag. *Id.* Williams explained and Brewer then inquired about the destination of the individuals. When Williams advised Brewer they were going to Atlanta, Brewer asked if they were not off the main road. Williams explained they were going to stop in Tallahassee to pick up a friend. *Id.*

Brewer, joined by Feagle, asked Williams if he had ever been arrested. Williams said he had been. *Id.* Brewer then asked Williams if there was anything in the truck that should not be there. Feagle asked if Williams was transporting any illegal drugs, narcotics or firearms. Defendant answered by shaking his head, indicating that he was not transporting any illegal drugs or firearms. The officers then asked if Williams had any objection to their looking in the truck and Defendant stated he was in a hurry. Brewer then asked if Williams had any objection to the officers looking in the truck. Defendant stated that he did object. According to the magistrate, Williams refused consent to search at 4:14 p.m.

Brewer then summoned Edmond from the truck and told both Defendants that the officers were going to have a dog walk around the truck and asked the Defendants to sit in the rear of the patrol car. *Id.* at 4. Williams objected to Brewer's request, at which time Williams was assured that he was not under arrest and that the Defendants could remain outside the patrol car. Brewer again stated he was seeking permission to search the vehicle. *Id.*

Williams then asked the officers why they wanted to search the vehicle. *Id.* According to the magistrate, Brewer stated the reason for the search was the lack of a proper tag on the vehicle. Brewer ex-

plained that he was giving the Defendants a break because he could have written a citation rather than a warning and he could have ordered the vehicle to be towed, and that he had no indication there had ever been a license plate issued for the truck.

Feagle then asked Williams what he had (in the truck, presumably). According to the magistrate, at 4:16 p.m. Williams replied that the driver of the car had his uncle's gun and that was all. *Id.* Feagle asked whether Defendant personally had drugs or a gun, and Defendant denied having either. *Id.*

Feagle stated that he was going to the truck to get the gun for his own protection. Williams protested, stating that his constitutional rights were being violated. *Id.* According to the magistrate, Brewer responded that he would place Defendant under arrest for driving without a tag and then his constitutional rights would go out the window. *Id.* Brewer told Williams he was asking for assistance and if he did not get assistance, there were other ways the officers could do this. *Id.* at 4–5. Brewer stated that the officers would take custody of the vehicle and repeated the possibility of towing the vehicle to the sheriff's department at Williams's expense. *Id.* at 5. The magistrate found that Williams was repeatedly asked where in the truck the gun was located but he did not indicate any further knowledge of its presence or location. *Id.*

According to the magistrate, at some point during the stop, one of the Defendants told the officers the vehicle tag had been lost for only two or three days, while the other Defendant said the tag had been lost for two or three weeks. The magistrate also found that at some time during the stop, one defendant told the officers they were travelling to Atlanta, while at some other time Williams indicated that they were travelling to Tallahassee to visit a friend, then to Atlanta. The magistrate's report does not specify the exact time these statements were made. The magistrate also noted that Deputy Brewer found that Williams was extremely nervous during the stop.

At some later time, a third officer arrived. Williams was asked again about the gun. Williams completely denied having a gun and stated that there was no gun in the truck. Williams was subsequently arrested for being a convicted felon in possession of a firearm. The Ford Bronco was later searched incident to the arrest and, according to the magistrate, "contraband" was found. *Id.*

In analyzing the legality of the stop and subsequent search of Defendant's vehicle, the magistrate noted that the initial vehicle stop was objectively reasonable. The magistrate then held that "once the officer issued a warning to the driver, the legitimate civil traffic stop was concluded." *Id.* at 6. The report states that "to detain the Defendant beyond the conclusion of the civil traffic stop under the circumstances present in this case, after being refused permission to search the vehicle, was unreasonable." *Id.* at 8. The magistrate further found that, even if Williams had not been unreasonably detained at the time he stated that there was a gun in the vehicle, no probable cause existed to arrest Williams for being a felon in possession of a firearm. *Id.* at 8–9 (citing and quoting a federal case on constructive possession). The magistrate proceeded to recommend suppression of evidence obtained pursuant to the search, and suppression of all statements made after Williams refused to consent to a search of the vehicle. *Id.* at 9–10.

## II. Facts

Based on the videotape of the traffic stop, *see* ex. 1, and the transcript of the evidentiary hearing before the magistrate, the Court makes the following findings of fact. To the extent the Court's findings do not conflict with the magistrate's findings, the Court adopts the magistrate's findings of fact.

At 3:51 p.m., Deputy Brewer stopped the vehicle. *See* ex. 1. After asking some preliminary questions and obtaining the Defendants' driver's licenses, Brewer returned to his car to check the licenses. A check of Williams's license revealed that Williams had several prior felony convic-

tions, including firearm, drug, and burglary offenses. *See* Transcript of evidentiary hearing before the magistrate judge, docket no. 79, at pp. 9 and 27 (hereinafter "Transcript").

From 4:11 to 4:12 p.m., Brewer wrote and explained the warning citation to Edmond. At 4:13 p.m., Brewer asked Williams to step out of the Ford Bronco and come to the rear of the truck, or the front of Brewer's patrol car. Edmond returned to the driver's seat of the Bronco. Prior to this time, from approximately 3:58 on, Deputy Feagle had generally engaged Williams in apparently casual conversation, with Feagle standing beside the Bronco as Williams sat in the passenger seat.

At 4:13 p.m., Brewer informed Williams of the warning citation issued to Edmond. The officer noted that there was no record that the vehicle had ever been issued a license plate (contrary to Williams's story that the tag had been lost), and stated the possibility that another officer down the road could stop the vehicle and issue Williams a full traffic citation as owner of a vehicle with no license plate. Brewer again asked Williams why there was no tag on the vehicle.

At 4:14 p.m., Brewer asked Williams a series of investigative questions. Brewer asked Williams where he and Edmond were headed to. Williams responded that they were going to Atlanta, and noted that he had his map in hand. Brewer noted that they were off the main road to Atlanta. Williams responded that they were going to see a friend in Tallahassee first. When asked whether he had ever been arrested, Williams responded in the affirmative by nodding his head. Brewer asked if there were anything in the truck that should not be in there. Williams responded, "Us", a sarcastic, tongue-in-cheek response indicating that he and Edmond should not be in the truck.[1] Feagle asked whether Williams was transporting any illegal drugs or firearms; Williams responded that he was not.

At 4:15 p.m., Edmond got out of the Bronco at Brewer's request, whereupon Brewer informed the Defendants that the officers intended to "put a dog around the truck", an apparent reference to a canine sniff. When the officers asked Williams to sit in the patrol car, Williams objected, at which time the officers assured Williams he was not under arrest and that he was free to remain standing in between the two vehicles.

Brewer asked for permission to search the vehicle at 4:15 p.m.. Williams then asked the officers why they would want to search, stuttering a bit as he asked the question. Brewer responded that he had given the Defendants a break by only writing a warning citation and that he could have had the truck towed for the tag violation. Brewer also advised the defendants that they would have to wait while a dog walked around the truck.

Brewer asked Williams what he had in the truck. At 4:15 p.m., only two minutes after the officers began their investigative questioning of Williams, he responded that his uncle's gun was in the truck, which "he [Edmond] has". At 4:16 p.m., Feagle asked where the gun was located, and stated that he was going to get the gun from the vehicle for his own protection. Williams stated that the gun was not in the glove compartment, but refused to tell the officers the exact location of the gun in the vehicle. Williams claimed his constitutional rights were being violated.

At 4:17 p.m., Feagle asked Williams what kind of gun was in the vehicle. Williams indicated some knowledge of the gun's type by starting to respond by saying "It's a ...", but then stopped himself and deferred to Edmond. Edmond described the gun as a "nine millimeter". Two minutes passed by during which Brewer returned to his patrol car, and then conferred with Feagle. Around this time Williams used his map to fan himself noticeably, in contrast to Edmond who appeared calm and almost stoic. At 4:19 p.m., Williams asked the officers to allow him to go the Bronco for a minute (although the tape is virtually inaudible at this point). Feagle denied Williams permission for safety reasons,

---

1. As events unfolded, it turned out that Williams's answer was absolutely correct.

stating that he (Feagle) didn't know Williams well enough to take the chance of allowing Williams to return to the vehicle, which Feagle knew contained a firearm. Williams proceeded to say something about going to jail. At 4:20 p.m., when asked by Brewer why he would be going to jail, Williams responded "for carrying a gun". Williams then retracted that statement, saying that he was not carrying a gun, and that the gun belonged to his uncle. Approximately ten more minutes went by during which the parties basically waited around for unknown reasons. At 4:30 p.m., Williams completely denied the presence of a gun in the truck because, he explained, he didn't want the officers to search the truck. Williams was arrested at 4:31 p.m. for being a felon in possession of a firearm. A search of the vehicle discovered: (1) over 200 grams of crack cocaine; (2) a quantity of powder cocaine; (3) two .9mm pistols and ammunition; (4) counterfeit $20.00 Federal Reserve notes; (5) and, other drug-related items, such as scales and razor blades.[2]

### Discussion

#### A. The Stop

■ There can be no legitimate dispute that the stop of Williams's vehicle was valid. A law enforcement officer "may stop a vehicle 'when there is ... probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles." *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir.1990) (quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979)). It is undisputed that Williams's vehicle was stopped when Officer Brewer observed that the truck had no license plate in violation Florida law. *See* Fla.Stat. § 316.605(1) (1990). Accordingly, the initial stop of the truck was lawful.

#### B. The Detention

■ The reasonableness of the officers' decision to detain Williams and his

vehicle is governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* allows police to stop and detain persons briefly in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed. *See United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir.1990). The *Terry* rationale applies with equal force to vehicle stops. *Tapia*, 912 F.2d at 1370 n. 2. "Reasonable suspicion" is determined from the "totality of the circumstances," *Sokolow*, 109 S.Ct. at 1585, and requires the officer to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention. *See Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. The "reasonable suspicion" required for a *Terry* detention is obviously less demanding than the requirement of probable cause ("a fair probability that contraband or evidence of a crime will be found") needed prior to conducting a search. *Sokolow*, 109 S.Ct. at 1585. However, "reasonable suspicion" requires the officer to have more than an "inchoate hunch" that criminal conduct is afoot based on unparticularized facts. *Id.*

■ In this case, Defendant's vehicle was stopped at 3:51 p.m. At 4:11–4:12 p.m., Edmond was issued a warning ticket. During the twenty minute interval between the stop and the issuance of the warning, the officers uncovered several facts which gave them reasonable and particularized suspicion that Williams was engaged in criminal activity. A check of Williams's identification, conducted prior to issuing the warning ticket, revealed that Williams was a convicted felon, including arrests and convictions for felony firearm, drug, and burglary charges. *See* Transcript at 9 and 27. Defendants gave conflicting stories about the lost tag, with one Defendant saying the tag had been lost for two or

---

**2.** It is also alleged that Williams later stated that, during the stop, Williams intended to shoot

the officers and leave them dead at the side of the road. *See* Transcript at 13–14.

three days, while the other Defendant said the tag had been lost for two weeks. Both of these stories were potentially false, as the officer had no record of a tag ever being issued to the vehicle.[3] In addition, the defendants gave conflicting stories about their destination, one stating that they were headed to Atlanta, the other stating they were going to visit a friend in Tallahassee (but then explaining that Atlanta was the ultimate destination). These facts, along with the somewhat strange and suspicious fact that the defendants were driving a vehicle with a cardboard tag, certainly gave the officers some reasonable suspicion that Williams was engaged in criminal activity.

The officers thus were justified in briefly detaining Williams in order to ask him a series of investigative questions to determine whether Williams was engaged in criminal activity. A review of the stop shows that the vehicle was stopped at 3:51 p.m., a warning citation was issued to Edmond at 4:11–4:12 p.m., and Williams was asked a series of questions by the officers beginning at 4:13 p.m. It took only two minutes of discussion with the officers before Williams stated that a gun was in the car, at 4:15 p.m.

Williams objects to this brief two-minute period of questions as unreasonable. In assessing whether a detention is too long in duration to be justified as an investigative stop, it is appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it is necessary to detain the defendant. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). In this case, the officers questioned Williams for only two minutes before he made a statement about a gun in the truck. The Court rejects any objection the Defendant has to the length of the stop from 3:51 p.m. to 4:13 p.m., as the officers used this time to check the Defendants' identifications, to ask some preliminary questions such as where the

Defendants were going and who owned the vehicle, and to write and explain the warning citation to Edmond.

Most of the questions asked of Williams by the officers from 4:13 p.m. to 4:15 p.m. were directed towards confirming or dispelling their reasonable suspicions about Williams. Brewer explained the warning ticket to Williams, asked him why the vehicle had no license plate, inquired again about the defendants' destination, and asked Williams whether he had ever been arrested. Feagle also asked Williams whether the vehicle contained any illegal drugs or firearms. These were legitimate investigative questions that were put to Williams, and the Court finds no fault in the officers' inquiry. Similarly, there was nothing impermissible about the request to search the vehicle. *Cf. United States v. Harris*, 928 F.2d 1113 (11th Cir.1991) (holding that an officer may briefly detain a suspect based upon reasonable suspicion, after giving him a warning ticket, to ask for consent to search his car).

When Williams denied consent to search, Brewer then informed the defendants that the officers would "put a dog around the truck". Brewer also stated that he could have the truck towed to the police station for not having a tag. While these statements by Brewer were not precisely directed towards confirming or dispelling his suspicions about Williams, the Court finds that these statements did not violate *Terry* for the following reasons. First, these statements were largely made in response to Williams's own question: Williams himself asked the officers why they would want to search the vehicle. The Defendant cannot object to the length of a detention which he himself lengthened somewhat by asking the officers a question. *Cf. Harris*, 928 F.2d at 1114–17 (where the court found it permissible for the officer to ask for consent to search a second time when the suspect himself asked the officer why he would want to search the car, and after consent had already been denied once). Second, there

---

**3.** Based on the absence of a license plate on the vehicle, Deputy Brewer suspected, among other things, the possibility that the vehicle was stolen. *See* Transcript at 18.

was nothing impermissible about Brewer's intention to "put a dog around the truck" to detect illegal drugs. *See United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (holding that a canine sniff is not a search within the meaning of the Fourth Amendment); *United States v. Morales–Zamora*, 914 F.2d 200 (10th Cir. 1990) (holding that police do not need particularized reasonable suspicion of *drug-related* criminal activity before subjecting an otherwise lawfully detained vehicle to canine sniff).[4] This statement was reasonably related to the officer's reasonable suspicion that criminal activity was afoot. Finally, the Court finds that these statements by Brewer did not unduly lengthen the detention or prejudice Williams.

 Once Williams informed the officers at 4:15 p.m. that a gun was present in the vehicle, the officers had probable cause to arrest Williams for being a felon in possession of a firearm and to perform a search incident to the arrest. *See infra* at 1560; Fla.Stat. § 790.23(1) (and accompanying Criminal Pattern Jury Instruction). Thus, Williams has no basis to object to the length of the detention after 4:15 p.m., since the officers could have arrested him at that point. The fact that the officers delayed in arresting Williams and asked him more questions may have inconvenienced him, but such delay (and any statements made by Brewer during the delay) became constitutionally irrelevant once the officers had probable cause to arrest Williams at 4:15 p.m.[5]

### C. The Search

 Subject to constitutional constraints, the lawfulness of an arrest by state officers is determined by reference to state law, the law of the state where the arrest occurs. *Ker v. California*, 374 U.S. 23, 37, 83 S.Ct. 1623, 1632, 10 L.Ed.2d 726

(1963).[6] Florida law prohibits a convicted felon from having any firearm in his "care, custody, possession, or control...." *See* Fla.Stat. § 790.23(1) (West.Supp.1991). The Florida Criminal Pattern Jury Instruction for Section 790.23 provides that a person has "possession" over a firearm within the meaning of the statute if the firearm "is in a place over which the person has control". The instruction further provides that possession may be joint, in that two or more persons may jointly have possession of a firearm, exercising control, in which case each of those persons is considered to be in possession of the firearm. *Id.*

The officers knew that Williams was a convicted felon from a check of his identification. The officers knew that the Ford Bronco belonged to Williams. By 4:15 p.m., the officers knew from Williams's own statement that there was a gun in the vehicle. From this information it was reasonable for the officers to conclude that there existed a fair probability that Williams was a convicted felon in possession of a firearm, and that contraband would be found from a search of the truck. The officers thus had probable cause to arrest Williams for violating Fla.Stat. § 790.23(1), and to perform a search of the vehicle incident to the arrest. As stated earlier, the fact that the officers waited for a few minutes to arrest Williams does not render the detention unconstitutional, since the officers already had probable cause to arrest. In addition, since the detention and subsequent search were permissible, all statements made by Williams during the detention should not be suppressed.

Accordingly, it is now

ORDERED AND ADJUDGED:

1. The Court hereby rejects the Magistrate Judge's Report and Recommendation to the extent inconsistent with this opinion and order.

---

4. In fact, it is hard to understand why Brewer did not subject the Ford Bronco to a canine sniff, since Brewer apparently had a police dog at the scene during part of the detention.

5. Further statements by Williams about the gun's type and location confirmed the officers' suspicions.

6. Thus, the magistrate's reliance on federal law relating to constructive possession was in error. *See* Report at 8.

2. Defendant Williams's motion to suppress is denied.

DONE AND ORDERED.