# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-04-00266-CR

**David Allen Cronin, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR2003-373, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## DISSENTING OPINION

I respectfully dissent from the majority's judgment reversing the judgment of the district court. Under a proper application of the standards governing our review of the district court's denial of Cronin's motion to suppress, we should affirm.

**The proper scope of our review**

The requirement of "reasonable suspicion" before initiating an investigatory detention is among our system's checks and balances that preserve freedom by preventing arbitrary or abusive use of power by the public servants with whom the people have entrusted authority. It prohibits law enforcement officers from initiating an investigatory detention based solely on mere subjective opinion, unparticularized suspicion, or hunch. *See, e.g.*, *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). Instead, a law enforcement officer must act based on specific articulable facts

that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Id*. at 492. This check and balance is maintained by courts: we are to subject detentions to the "detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search and seizure in light of the particular circumstances." *Id*. at 493 (quoting *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)).[1]

But this does not mean that our Court, in the guise of guarding against detentions based on mere subjective opinion or surmise, itself merely subjectively second-guesses law enforcement decisions. To the contrary, we are to employ a "totality of the circumstances" analysis that requires us to respect the common-sense, reasonable judgments of law enforcement officers, as informed by all surrounding facts and circumstances and the rational inferences and deductions officers may draw from them based on their experience and familiarity with the areas they serve. As the United States Supreme Court has explained:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. . . . But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the person stopped of criminal activity.

---

[1] And it is the proper application of this standard that ensures that, in the majority's words, "effective policing [is] not at the expense of the Constitution." Slip op. at 12. Certainly that is the goal of our inquiry here. My departure from the majority concerns where we draw the lines between effective policing, constitutional limitations, and the respective roles of the courts charged with enforcing those protections.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis of scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. . . . "[T]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."

*U.S. v. Cortez*, 449 U.S. 411, 417-18 (1981) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968));

*Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997) (adopting, as "well reasoned and persuasive," the rationale of *Cortez* and *U.S. v. Sokolow*, 490 U.S. 1, 8 (1989)).

In sum, the "totality of the circumstances" analysis has two components. First, a reviewing court ascertains what the "whole picture" is. This "whole picture" must include the full range of objective facts and circumstances—the "historical facts"—surrounding the investigatory detention. Additionally, it includes background facts that inform a law enforcement officer's assessment of the historical facts and permit the officer to draw rational inferences and deductions regarding the significance of the historical facts. Such inferences, too, are included in the whole

3

picture that reviewing courts consider. Thus, as the Texas Court of Criminal Appeals recently acknowledged, "law enforcement training or experience may factor into a reasonable-suspicion analysis," *Ford*, 158 S.W.3d at 494, and that, viewed through that lens and in full context, otherwise innocuous or innocent facts may indicate criminal conduct. *Woods*, 956 S.W.2d at 38 ("there may be instances when a person's conduct viewed in a vacuum, appears purely innocent, yet when viewed in light of the totality of the circumstances, those actions give rise to reasonable suspicion."); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (internal quotations omitted).

Other background facts that reviewing courts must consider include the nature of the local area and the customs of its inhabitants with which law enforcement officers (and trial judges) are familiar. We are to "give due weight to inferences drawn from [historical] facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). The Supreme Court has explained the reasoning underlying this requirement:

> A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.

*Id*. The same objective facts, in other words, may yield different inferences and deductions depending on the nature of the local environment and the customs of its inhabitants. As the Supreme Court observed when striking down a Ninth Circuit decision finding a detention unreasonable, "[w]e think

4

it quite reasonable that a driver's slowing down, stiffening of posture and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona). [The officer] was entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants." *Arvizu*, 534 U.S. at 275-76. Similarly, we are to respect the rational inferences and deductions that local law enforcement officers may derive from their experience and familiarity with the diverse circumstances of the areas they serve—and avoid merely assuming our own interpretation of the facts from the perspective of our Austin location.

Only after this "whole picture" is ascertained by the reviewing court does the court proceed to the second step of the "totality of the circumstances" analysis, assessing the objective reasonableness of the investigatory detention. The first prong of the "totality of the circumstances" analysis is controlled almost entirely by trial courts. In our appellate review, we are to give virtually complete deference to a trial court's determination of the "whole picture." *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *see Ornelas*, 517 U.S. at 699. Additionally, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and it may choose to believe or disbelieve any or all of a witness's testimony. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003); *Wood v. State*, 18 S.W.3d 642, 646 (Tex. Crim. App. 2000); *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993); *Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991). We review *de novo* only the trial court's assessment, based on the "whole picture," whether law enforcement

5

acted objectively reasonably in concluding that a person actually is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492.

Furthermore, we are obligated to uphold the trial court's ruling denying a motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003); *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). That rule holds true even if the trial court gave the wrong reason for its ruling. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

**Application**

At the suppression hearing, Officer Anderson identified a number of objective facts and circumstances underlying her conclusion that "it was just very suspicious why [Cronin] was there." The record reflects the following: at approximately 1:30 in the morning of Wednesday, June 25, 2003, Officer Anderson, a thirteen-year veteran of the New Braunfels Police Department, was patrolling along Farm-to-Market Road 306 westward from Interstate 35. No other vehicles were on FM 306 at that late hour. Officer Anderson noticed a pickup truck with a camper moving slowly through a parking lot alongside a local business, Doug's Barbeque, near a dumpster. The truck appeared to be coming from the back of the business. The parking lot was empty and dark, and the business was closed—and had been for several hours.

Officer Anderson was familiar with the business and the layout of its property, having previously patrolled the area; she had also investigated the vandalism or attempted break-in of a

6

nearby business one-and-a-half months earlier.[2]  A paved parking area extends around the sides and

front of the business.  One side is where Officer Anderson first saw the truck; on the other side are

picnic tables blocking access to the back area from that side.  The pavement ends near the back of the

building, and a semi-circular gravel driveway continues into an open field bounded by trees and a

ditch.  These topographical features, Officer Anderson explained, would have made it extremely

difficult, if not impossible, for the defendant to reach the back of the business by driving through the

field.  As Officer Anderson explained, "There is mainly a field-type area back behind it, just open

field grass.  Nobody does anything with it."  However, between the gravel driveway and the back of

the Doug's Barbeque building is a stand-alone storage building, the only structure located behind the

building.

The State did not comprehensively develop background facts regarding local custom

to place these historical facts in context, nor did it attempt to develop whether or how Officer

Anderson's experience as a thirteen-year veteran of the New Braunfels police department informed

her assessment of the historical facts.  However, Officer Anderson did supply some significant

background facts that informed her assessment of the situation.  She recounted that, in her prior

patrols of the area, she had *never* seen vehicles in the business's parking lot after midnight.  Similarly,

she observed, with reference to the "field-type area back behind" the business, "Nobody does anything

with it," a statement that the district court could have interpreted to mean that individuals rarely or

---

[2] The following facts are reflected both in Officer Anderson's testimony and in a drawing
she made of the property, which the State introduced into evidence at the suppression hearing.

never went into that area. Finally, as previously noted, the only structure in this area behind the restaurant was a storage building.

Against this backdrop of historical and background facts, I would hold that Officer Anderson did not act unreasonably in suspecting that crime was likely afoot when she witnessed Cronin appearing to emerge from a secluded, inaccessible storage area behind a closed business at 1:30 a.m. on a weeknight, especially where the streets were empty, she had never previously witnessed anyone in the parking lot after midnight, it was unusual for anyone to be in the area behind the business, and that area contained only a storage building. I would accordingly hold that the district court did not abuse its discretion in denying Cronin's motion to suppress and affirm the district court's judgment.

The majority overlooks much of the "whole picture" we are required to consider under the "totality of the circumstances" standard. As suggested by the case law it invokes, the majority seemingly views Officer Anderson's stopping of Cronin to be supported by nothing more than Cronin's mere presence in a parking lot late at night. Were that actually the case, I would be inclined to join the majority. But Officer Anderson, as we have seen, identified numerous other objective facts and circumstances and drew rational inferences from them based on her familiarity with the restaurant property and custom in the New Braunfels community. Again, we are to give deference to "inferences drawn from facts by resident judges and local law enforcement officers" in light of local conditions. *Ornelas*, 517 U.S. at 699 ("A trial judge views the facts of a particular case

8

in light of the distinctive features and events of the community" and such background facts "provide a context for the historical facts, and when seen together yield inferences that deserve deference.").[3]

Assuming the "whole picture" is properly considered, the case law cited by the majority is either distinguishable or supports affirmance. In truth, neither party cites a case involving facts precisely like this one. *See Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994) (individuals were found in exposed parking lot area during afternoon).[4] The cases the majority cites thus have limited precedential value under the "totality of the circumstances" standard, which is highly fact-specific:[5] "[t]o the extent that a totality of the circumstances approach may render appellate review less circumscribed by precedent than otherwise, it is the nature of the totality rule." *Arvizu*, 534 U.S. at 276.

The majority relies principally on cases that predate the Texas Court of Criminal Appeals's adoption of the "totality of the circumstances" approach in *Woods*.[6] Yet even during its

---

[3] As the supreme court has acknowledged, background facts are "rarely the subject of explicit findings," and no such findings were made here, but such facts can nonetheless "inform the [trial] judge's assessment of the historical facts." *Ornelas v. United States*, 517 U.S. 690, 700 (1996).

[4] *See also Johnson v. State*, 658 S.W.2d 623, 625-27 (Tex. Crim. App. 1983) (truck loaded with furniture was parked at 5:00 a.m. in "well lighted" parking lot in front of a closed McDonald's but "was visible from the main thoroughfare"); *Tunnell v. State*, 554 S.W.2d 697, 698-99 (Tex. Crim. App. 1977) (men were sitting at 2:16 a.m. in "well-lighted hospital parking lot" only "a short distance" from factory that operated twenty-four hours a day).

[5] Reasonable suspicion, as well as probable cause, "are not readily, or even usefully, reduced to a neat set of legal rules" but "are instead fluid concepts that take their substantive content from the particular contexts in which the standards are being applied." *Ornelas*, 517 U.S. at 695-96 (internal citations omitted). Thus, "each case is to be decided on its own facts and circumstances." *Id*. at 696 (quoting *Ker v. California*, 374 U.S. 23, 33 (1963)).

[6] In these cases, the Texas Court of Criminal appeals employed a different analysis that atomized the reasonable suspicion inquiry into discrete elements: (1) reasonable suspicion of the

9

pre-*Woods* era, the Texas Court of Criminal Appeals suggested that a vehicle being "partially hidden or situated near the rear door" of a business late at night would be a factor supporting reasonable suspicion. *Johnson*, 658 S.W.2d at 626; *see also Amorrella v. State*, 554 S.W.2d 700, 702-03 (Tex. Crim. App. 1977) ("undeniably suspicious circumstances" included car being parked in visible location but immediately next to closed store at 1:30 a.m., when "all other businesses in the area were closed," with trunk open and motor running). The majority does cite a more recent case from the Fourteenth Court of Appeals, *Klare v. State*, 76 S.W.3d 68 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd), but then Chief Justice Brister, in dissent, points out reasons why we should be hesitant to rely upon it: (1) as in the present case, the majority had relied on cases that predated the Texas Court of Criminal Appeals's adoption of the current "totality of the circumstances" test; and (2) the majority had improperly applied a "divide-and-conquer analysis" to eliminate, on a piecemeal basis, particular facts and circumstances as a basis for reasonable suspicion. *Klare*, 76 S.W.3d at 77-78 (Brister, C.J., dissenting).[7] I would also observe that the officer in *Klare*, unlike here, did not state that he had *never* seen anyone in the parking lot at that time of night or that "no one" ever entered the area, or otherwise elaborated on such features regarding the custom and character of that locality.

---

occurrence of past or present activity that is "out of the ordinary"; (2) some suggestion to connect the detained person with the unusual activity; and (3) some suggestion that the "unusual" activity is related to a crime. *E.g.*, *Johnson v. State*, 658 S.W.2d 623, 626 (Tex. Crim. App. 1983). Along with this, the court would not find an inference of criminal activity reasonable if the court regarded the activity to be equally consistent with innocent activity. *Id*.

[7] The majority also cites the recent case of *State v. Bryant*, 161 S.W.3d 758, 762 (Tex. App.—Fort Worth 2005, no. pet.). Contrary to the majority's suggestion, the court never reached the issue of whether facts supporting reasonable suspicion were either present or lacking before the suspect opened his car door. *Id*.

10

Finally, the mere fact that Officer Anderson did not witness any traffic violations, erratic driving, or trespassing by Cronin, or other criminal activity in the area that evening, slip op. at 11-12, does not render her stop unreasonable. The "totality of the circumstances" test requires consideration of the "whole picture," not merely isolated components of it. *Sokolow*, 490 U.S. at 8-10. Moreover, conduct that might appear purely innocent in a vacuum can nonetheless, when viewed amid the totality of the circumstances, give rise to reasonable suspicion. *See Woods*, 956 S.W.2d at 38.

I respectfully dissent.

_____

Bob Pemberton, Justice

Filed:   September 23, 2005

Publish

11